126 N.J. Super. 321 (1973)
314 A.2d 376
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
RAY R. LOUF, JOSEPH ZICARELLI AND FRANK MALLAMACI, DEFENDANTS-APPELLANTS.[1]
Superior Court of New Jersey, Appellate Division.
Argued November 6, 1972.
Decided July 2, 1973.
*324 Before Judges FRITZ, LYNCH and McGOWAN.
Mr. Leonard Meyerson argued the cause for appellant Louf (Messrs. Miller, Hochman, Meyerson & Miller, attorneys; Mr. Gerald D. Miller, of counsel and on the brief).
Mr. Michael A. Querques argued the cause for appellant Zicarelli (Messrs. Querques, Isles & Weissbard, attorneys; Mr. Harvey Weissbard, of counsel and on the brief).
Mr. I. Mark Cohen, Assistant Deputy Public Defender, argued the cause for appellant Mallamaci (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. Michael R. Perle, Deputy Attorney General, argued the cause for respondent (Mr. George F. Kugler, Jr., Attorney General, attorney).
The opinion of the court was delivered by LYNCH, J.A.D.
Defendants appeal from their conviction after jury trial on a five count indictment returned by the State Grand Jury on July 1, 1970. The first count charged that[2] on or about July 1, 1965 and on or about April 8, 1970, *325 "at the Town of West New York, in the County of Hudson; at the City of Jersey City, in the County of Hudson; and elsewhere," defendants Louf, Zicarelli and Mallamaci conspired to have defendant Louf, a Captain of detectives in the Hudson County Prosecutor's Office, commit the crime of misconduct in office, "that is, that the said RAY R. LOUF would use his said public office to keep safe from investigation, detection, and prosecution an illegal gambling enterprise which JOSEPH ZICARELLI then and there controlled and supervised * * *." It was charged that, as part of the conspiracy, Zicarelli would pay Louf $100 per month, that Louf would not fulfill his duties as Captain of Detectives and would provide and furnish information about and warning of law enforcement activity directed at the said illegal gambling enterprise "which JOSEPH ZICARELLI controlled and supervised." Of the three overt acts alleged, two represented payments of $100 each to Louf on March 4, 1970 and March 31, 1970, both occurring in West New York. The third alleged a telephone conversatiion between Louf and Peter J. Policastro in Hudson County on April 4, 1970. The second and third counts of the indictment charged Louf with accepting the bribes on March 4, and 31, 1970 and the fourth and fifth counts charged Zicarelli and Mallamaci with bribery on said dates in West New York.
Having been found guilty, Louf was sentenced to State Prison for a term of 16 to 18 months on each of the three counts to run consecutively and was fined $3,000. Zicarelli was sentenced to consecutive prison terms totalling 6 to 7 1/2 years and a fine of $1,000 on each of three counts. The prison term, however, was to run concurrently with the sentence of 12 to 15 years previously imposed upon Zicarelli under indictments charging him, Mallamaci, and others with conspiracy involving payoffs to Mayor Armellino of West New York, for protection of Zicarelli's gambling enterprise. See State v. Zicarelli, 122 N.J. Super. 225 (App. Div. 1973), *326 certif. den. 63 N.J. 252 (1973). Mallamaci was sentenced to consecutive terms of 20 to 22 months on each count, said sentences to run concurrently with the sentence imposed in State v. Zicarelli, supra, and he was fined $1,000 on each count, or a total of $3,000.
On appeal, Zicarelli makes the following contentions: (I) double jeopardy as well as due process considerations barred the trial of these charges; (II) the venue of the within indictment was improperly laid in Burlington County; (III) the court erred in permitting the tape recording of a conversation between Policastro and Zicarelli to be received in evidence and in allowing the jury to use a State-prepared transcript of that recording as a listening aid; (IV) defendant's motion for judgment of acquittal should have been granted as to the substantive counts; (V) the court erred in its charge; (VI) the court erred in permitting testimony that Zicarelli was in custody during part of the time covered by the indictment; (VII) the court erred in permitting the State to proceed with its proofs on the basis that Fluccari was a co-conspirator; (VIII) the court erred in permitting the State to adduce testimony that Fluccari could not be found; (IX) the court erred in permitting a police officer to express his opinion that in a gambling operation as described in this case there must be bribes to public officials; (X) the court improperly permitted evidence of other crimes to be introduced at trial; (XI) the prosecutor's summation was so highly prejudicial as to deny defendant a fair trial; and (XII) the court's action in sustaining an objection during the summation by Zicarelli's attorney and then reprimanding counsel was highly prejudicial.
In substance, Mallamaci makes the same contentions, except for Points II, VI, X and XII. He further argues: (VII) the trial judge abused his discretion by failing to grant [his] motions for mistrial; (VIII) the defense motions for a judgment of acquittal should have been granted; *327 (IX) the trial court should have granted [his] motion for a severance during the course of the trial; and (X) [his] sentence and fine are manifestly excessive and should be reduced.[3]
Louf also contends that the designation of venue in Burlington County was improper and that the transcripts of the tapes should not have been submitted to the jury. In addition, he makes the following separate contentions: (I) the court erroneously permitted testimony concerning conspiracies separate from that conspiracy set forth in the indictment in this case; (II) the court erroneously instructed the jury concerning the elements of the crime of bribery; (IV) the court erroneously submitted recordings to the jury without deleting irrelevant but prejudicial material; (VI) the court improperly limited the attempts to impeach the credibility of the State's key witness; (VII) the court improperly permitted a police officer to testify that in his opinion some public officials in Hudson County were receiving payoffs; and (VIII) the sentence imposed upon him was arbitrary.
Zicarelli's points II, III, VI, VII and VIII, and those raised by Mallamaci which correspond thereto, were previously made and disposed of in this court on appeal in the prior prosecution of Zicarelli and Mallamaci, Mayor Armellino of West New York, and others. State v. Zicarelli, supra, 122 N.J. Super. 225. That opinion is incorporated herein by reference and said points may be considered as disposed of thereby.
We shall first consider the remaining contentions of defendants Zicarelli and Mallamaci under Subheading "A." Defendant Louf's contentions will be later discussed under Subheading "B."

*328 A.

CONTENTIONS OF DEFENDANTS ZICARELLI AND MALLAMACI

(1)

Double jeopardy and denial of due process of law
Defendants Zicarelli and Mallamaci contend that the conspiracy herein charged against them was the same conspiracy which was prosecuted and resulted in the earlier decision in State v. Zicarelli, supra (SGJ-2-70-8H), here called "the Armellino indictment." There it was charged that Zicarelli and Mallamaci conspired with Mayor John Armellino of West New York, and others named, between on or about November 4, 1965 and on or about April 8, 1970. That conspiracy was said to have been committed "at the Town of West New York, in the County of Hudson; at the City of Hoboken, in the County of Hudson; and elsewhere * * *," and had for its object that John Armellino, Mayor of West New York, would illegally engage in misconduct in office by using his office "to keep safe from investigation, detection, and prosecution an illegal gambling enterrise with [sic] JOSEPH ZICARELLI, FRANK MALLAMACI, WILLIAM C. FOURGEREL, SR., WILLIAM C. FOURGEREL, JR. and LUDWIG BRUSCHI, also known as NINI, then and there controlled, supervised and operated * * *." It was further charged that Zicarelli, Mallamaci, and the others named would "control, supervise, and operate an illegal gambling enterprise * * *" and that, as part of the conspiracy, Zicarelli would pay to Mayor Armellino the sum of $1,000 per week in return for the Mayor's failing to fulfill his duties to enforce the criminal laws of New Jersey. Eight overt acts in furtherance of the conspiracy were also charged, six of which were payments to Armellino in West New York and two of which were conversations on February 20, 1970 and March 9, 1970, between Zicarelli and Policastro at Hoboken, New Jersey, and Mallamaci and Policastro at West New York, respectively.
*329 At the beginning of the trial herein, defendants Zicarelli and Mallamaci moved for dismissal of the conspiracy count in the indictment on grounds of double jeopardy, and denial of due process of law by reason of the harassment involved in the prosecution herein of the same conspiracy (so they argued) as that upon which they had already been convicted with Armellino. The State responded that the motion was untimely under R. 3:10-2 which requires that such motions are to be made prior to trial.[4]
As to the merits of the motion, the State argues that the instant conspiracy is a separate conspiracy from that in the Armellino case and that, while both "conspiracies" had a common nucleus (Zicarelli and Mallamaci), the interests and motives of the various persons named as conspirators in the two trials were separate and distinct, and depended on different evidence. Defendants' contention in support of the defense of double jeopardy is that a single conspiracy was involved with a common object, i.e., the protection of the gambling enterprise controlled and supervised by Zicarelli, and encompassing both the prior and instant indictments. Thus, say Zicarelli and Mallamaci, they have been tried and convicted twice for the same offense in violation of the Fifth Amendment of the United States Constitution. They also urge the due process argument grounded in the harassment involved.
While denied by defendant Louf as to his own involvement when he testified on his defense in this case, the evidence produced by the State tended to establish the following facts. First, the dramatis personae: Zicarelli was the "overall" boss of gambling in Hudson County, and it was necessary for the *330 protection of his gambling enterprise to pay "protection money" to various public officials. Mallamaci was his "righthand man," through whom his "payoffs" were channeled. He also acted on Zicarelli's behalf while the latter was absent from Hudson County and confined at Yardville in another matter. William Fourgerel, Sr. was the supervisor of the North Hudson phase of Zicarelli's gambling enterprise.[5] Peter Policastro, the State's principal witness, was a courier for Zicarelli for the purpose of paying money to the public officials who could, and would, "protect Zicarelli's gambling enterprise."
Policastro testified that he paid money on Zicarelli's behalf to the Mayors of West New York (Armellino), Guttenberg (Klein), North Bergen (Sarubbi), and also to John Theurer, Republican County Chairman of Hudson County.[6] There was also evidence that Zicarelli's "empire" extended into Bayonne, though no evidence was produced of payments to officials there. On the county level, Policastro made payments to defendant Raymond Louf, Captain of detectives of the Hudson County Prosecutor's Office, and to Detective Walczak, also of that office, as well as to Theurer.
Policastro had been a policeman in West New York for 23 years, reaching the rank of Detective-Sergeant by 1962, at which time he retired on a disability pension on the advice of Mayor Armellino. In the 1940's he had received $25 per week in a "protection" phase of a gambling operation. That activity, however, so far as appears, predated and was not connected with Zicarelli or his organization. After his retirement in 1962, Policastro opened a private detective agency which proved unsuccessful. In an effort to sustain *331 it, he went into debt for over $100,000, including substantial loans from a bank, with collateral for the loans being supplied by Zicarelli, whom he had known for approximately 15 years.
In 1963, Lout spoke to Policastro and asked if he would approach Zicarelli about Louf providing information concerning gambling enforcement on a county level. Louf was then put "on the payroll" at $25 per week. In 1965, Policastro began to carry protection money for Zicarelli to certain "public officials." Louf's "pay" was later adjusted to $100 per month. At a meeting on March 4, 1970, Policastro made a payment to Louf stating that he had received the $100 from Mallamaci, who was acting for Zicarelli after he had left Hudson County for his confinement as set forth above. The last payment was made on March 31, 1970, at Salerno's Restaurant in West New York.
Louf provided Policastro with information that the Prosecutor was using a small, white car with Massachusetts plates in gambling raids. On another occasion, after Mallamaci called Policastro concerning a raid made the night before at the main office of the gambling operation, Policastro called Louf to ask why the raid had taken place and was advised that it was probable that a man named "Ziggy" in the Prosecutor's office had led the raid. Policastro in turn relayed this information to Mallamaci. Louf told Policastro that the "little man," J.V. Kenny, was asked by Chief Kropke of the Hudson County Police to take "Ziggy" out of the prosecutor's office. By way of further information, on March 4, 1970, Louf told Policastro that a raid might take place in West New York. Whether it did or not does not appear. Finally Policastro agreed to become an informer for the State and taped several conversations with Zicarelli, Mallamaci, Theurer and defendant Louf.
Policastro had given substantially the same testimony (except as to defendant Louf's involvement) in the prior Armellino trial. Additionally, except for the tapes of conversations between him and Louf introduced in the instant *332 trial, tapes which were introduced in the prior trial and which recorded several conversations between Policastro, Zicarelli and Mallamaci, were also introduced in evidence in the subject trial. Further, all witnesses who appeared in the instant case had also testified in the prior trial. Thus, Zicarelli and Mallamaci contend that in both the Armellino matter and in this case the State prosecuted a single conspiracy  that which was formed to keep safe from investigation, detection and prosecution the gambling enterprise which was controlled and supervised by Zicarelli in Hudson County, of which Armellino and Louf were merely "spokes" in the "wheel" with Zicarelli its core.
It is now well established that the State may not carve up a single conspiracy into smaller conspiracies for the purpose of multiple prosecutions. See Scarlett v. State, 201 Md. 310, 93 A.2d 753 (Ct. App. 1953); United States v. Cohen, 197 F.2d 26 (3rd Cir.1952); United States v. Palermo, 410 F.2d 468 (7th Cir.1969). If, in fact, the alleged conspiracy is but one overall collusive arrangement, it must be treated as such by the prosecution. State v. Ferrante, 111 N.J. Super. 299, 303 (App. Div. 1970). If there be a "single conspiracy," it is one crime, for which a defendant may be prosecuted but once. If it is split up into several conspiracies, a defendant would be convicted and punished for several crimes though he has committed only one. United States v. Palermo, supra 410 F.2d at 470. There it was said:
The government is not free to arbitrarily decide whether there is one agreement or several. If the agreement
* * * contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one.
United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 54 L.Ed. 1168 (1910). To convict a party severally for being part of two conspiracies when in reality he is only involved in one overall *333 conspiracy would be convicting him of the same crime twice. Short v. United States, 91 F.2d 614 (4th Cir.1937); United States v. American Honda Motor Company, 271 F. Supp. 979 (N.D. Calif. 1967).
Here, there were not only the Armellino and Louf indictments but also separate indictments involving Zicarelli and Mallamaci with Klein, the Mayor of Guttenberg, with Theurer, the Hudson County Republican Chairman, and Detective Walczak of the Hudson County Prosecutor's office, all of whom allegedly received "payoffs" for protection of Zicarelli's gambling enterprise. Were these five separate conspiracies, or only a single one? Specifically here, were the Armellino and Louf conspiracies separate and distinct so that Zicarelli and Mallamaci can be prosecuted, convicted and punished for both? The answer lies basically in an understanding of the seeming dichotomy born of the decisions in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) and Blumenthal v. United States, 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947).
The State leans heavily on Kotteakos in equating the Armellino and Louf indictments to the separate conspiracies there involved. The defense relies on Blumenthal as demonstrating a single conspiracy with Zicarelli as its "core."
Kotteakos involved an indictment naming 32 defendants who sought to obtain FHA loans in a fraudulent manner. All were processed through one Brown who was the common and key figure, as was Zicarelli here. Brown acted as broker in placing the loans, presumably for modernization and renovation of the home involved. He charged a 5% commission for his services. He knew, when he obtained the loans, that they would not be used for the purposes stated in the application. All defendants were indicted for a single conspiracy and seven were convicted. None of the applicants had any connection with one another though all dealt through Brown as their agent. The Government conceded on appeal that though only one conspiracy was charged, at least eight *334 separate ones were proved. The Supreme Court held that it was prejudicial to prosecute a single conspiracy against all defendants. Here, the State contends that the Armellino and Louf "schemes" were, as the eight in Kotteakos, separate conspiracies and that it would have been prejudicial to have prosecuted Louf as a defendant with Armellino in the first case. That being so, it follows, says the State, that here there were separate conspiracies and not a single one.
Blumenthal distinguished and explained the real meaning of Kotteakos. In Blumenthal, the indictment charged a single conspiracy in a single count. Its object was to effect the illegal sale of whiskey at prices above the ceiling set by the OPA in violation of the Emergency Price Control Act. To accomplish this purpose, several sales persons participated. The Court found that there really were two "agreements"  (as the State contends there were two here, Armellino's and Louf's)  but that they "were merely steps in the formation of the larger and ultimate more general conspiracy." 332 U.S. at 558, 68 S.Ct. at 257. The Court said:
In that view it would be a perversion of justice to regard the salesmen's ignorance of the unknown owner's participation as furnishing adequate ground for reversal of their convictions. Nor does anything in the Kotteakos decision require this. The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.
The case therefore is very different from the facts admitted to exist in the Kotteakos Case. Apart from the much larger number of agreements there involved, no two of those agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether *335 any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, overall, comprehensive plan.
Here the contrary is true. All knew of and joined in the overriding scheme. All intended to aid the owner, whether Francisco or another, to sell the whiskey unlawfully, though the two groups of defendants differed on the proof in knowledge and belief concerning the owner's identity. All by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey. True, each salesman aided in selling only his part. But he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith.
We think therefore that in every practical sense the unique facts of this case reveal a single conspiracy of which the several agreements were essential and integral steps, and accordingly that the judgments should be affirmed. [Emphasis added].
That is the situation here. For the same reasons we conclude that there was a single conspiracy involved in both the Armellino and Louf indictments.
In United States v. Cohen, supra, in meeting a contention that some of the conspirators did not know one another, it was said:
It was established that, during the years in question, all the defendants were responsible for a steady flow of narcotics southward from Newark and New York. "That being true, a jury might have found that all the accused were embarked upon a venture, in all parts of which each was a participant, and an abettor in the sense that the success of that part with which he was immediately concerned, was dependent upon the success of the whole." United States v. Bruno, et al., 2 Cir., 1939, 105 F.2d 921, 922, reversed on other grounds, 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257. See also Lefco v. United States, 3 Cir., 1934, 74 F.2d 66. [197 F.2d at 29; Emphasis added].
And as stated in United States v. Hoffa, 367 F.2d 698 (7th Cir.1966), vacated 387 U.S. 231, 87 S.Ct. 1583, 18 L.Ed.2d 738 on remand D.C., 273 F. Supp. 141, aff'd 402 *336 F.2d 380 (7th Cir.), vacated 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297 (1969):
Although the Government was required to establish one conspiracy rather than a series of separate conspiracies, Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, the fact that a conspiracy's various members may play different roles in executing it, and have dissimilar motives for participating in it, does not mean that a single conspiracy does not exist. [at 706].
In United States v. Manarite, 448 F.2d 583, 589-590 (2nd Cir.1971), cert. den. 404 U.S. 947, 92 S.Ct. 298, 30 L.Ed.2d 264 (1971), the court referred to what is known as a "wheel conspiracy":
In such conspiracies, whether the spoke participants may be found to be members along with the core conspirators depends on whether or not the "spokes" knew or had reason to know of the existence, but not necessarily the identity, of one or more of the other spoke participants in the wheel conspiracy. Compare Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) with Blumenthal v. United States, 332 U.S. 539, 559, 68 S.Ct. 248, 92 L.Ed. 154 (1947). See also United States v. Andolschek, 142 F.2d 503, 507 (2nd Cir.1944).
On this record it is obvious that Alexander must have known that this material which was delivered to him in quantities of 10,000 copies at a time was also being distributed to other dealers. He visited Portela in New York and must have been aware of the nature and extent of the conspiracy and its operation. See United States v. Aiken, 373 F.2d 294 (2nd Cir.1967), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967).
See also United States v. American Honda Motor Company, 273 F. Supp. 810 (N.D. Ill. 1967), and United States v. American Honda Motor Company, 271 F. Supp. 979 (N.D. Cal. 1967).
In United States v. Varelli, 407 F.2d 735 (7th Cir.1969), cert. den. sub nom Saletko v. United States, 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972), a case here cited by the State, the Court said:
In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform *337 different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy. However, where various defendants separately conspired with a common conspirator to obtain fraudulent loans from an agency of the United States, the government conceded that there were several conspiracies since there was no overall goal or common purpose. [Id. at 742; emphasis added].
In Varelli, as the court held, there were clearly two separate conspiracies: (1) to hijack polaroid equipment, and (2) to hijack silver shipments. The hijacking of the polaroid equipment did not find its origin in any of the discussions with respect to the hijacking of the silver shipments. The polaroid hijacking represented a single transaction with a single purpose and did not contemplate hijacking of the silver. Id. at 743-744. Analysis of the nature of the agreement involved in the Zicarelli indictments reveals that there was indeed one "overall agreement" among the various parties, but the "spokes" (including Armellino and Louf) were to perform different functions in order to carry out the objectives of the conspiracy, i.e., to protect Zicarelli's gambling enterprise in Hudson County. This is the pattern of a single conspiracy. Varelli at 742.
The State here cites Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). There the Government claimed that an indictment charging a conspiracy to permit seven different offenses under the Federal liquor-tax laws charged seven offenses for which seven separate sentences could be imposed. The Government conceded that there was only a single agreement to commit the offenses. There the Court said:
Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.

* * * * * * * *
A conspiracy is not the commission of the crime which it contemplates, and neither violates nor "arises under" the statute whose violation is its object. [citing cases]. Since the single continuing *338 agreement, which is the conspiracy here, thus embraces its criminal objects, it differs from successive acts which violate a single penal statute and from a single act which violates two statutes. [Id. at 53-54, 63 S.Ct. at 102.].
Thus the argument of the State that the indictments involved here contemplated separate crimes (a) to have Armellino commit misconduct in office, and (b) to have Louf do so, is flatly rejected by Braverman.
In State v. Currie, 41 N.J. 531 (1964), due deference was given to the constitutional safeguard against double jeopardy and the assurance it gives that the State, with its great resources, will not be permitted to harass and oppress the individual by multiple prosecutions for the same offense. But, as Justice Jacobs said in that case: "The difficulty arises in determining just when we are dealing with the same offense within the contemplation of the safeguard." Id. at 536. Then, after recounting the application in our State of the "same transaction test" in some cases and "the same evidence test" in others, the Justice observed, citing State v. DiGiosia, 3 N.J. 413, 419 (1950), and State v. Roller, 29 N.J. 339, 346 (1959), that neither test is "absolute or inflexible." Currie, 41 N.J. at 538. He concluded that the case of State v. Hoag, 21 N.J. 496 (1956), aff'd 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958), furnished "poignant evidence of the futility of efforts extended towards the formulation of a single level test to operate absolutely and inflexibly throughout the field of double jeopardy." Speaking for the Court he said: "In applying the prohibition against double jeopardy, the emphasis should be on underlying policies rather than technisms. The primary consideration should be fairness and fulfillment of reasonable expectations in the light of the constitutional and common law goals." And he added that "practical factors" play a vital part in the molding of double jeopardy doctrine. Thus, while State v. Currie suggests a philosophy which should motivate the application of the protection against double jeopardy, the case does not, *339 because of a different factual context, meet the issue posed here.
In answer to claims of double jeopardy by defendants Zicarelli and Mallamaci, the State begins with the premise that the gravamen of the offense of conspiracy is the "agreement," rather than the ultimate objective of the conspirators, citing State v. Dennis, 43 N.J. 418, 423 (1964). The argument goes on that "Armellino only adhered to an agreement to commit misconduct in office, not to participate in that enterprise." So too, the State says, Louf conspired "to conduct misconduct in office, the protection of an illegal business." But, it is said by the State, "the agreement offered * * * [to Zicarelli and Mallamaci] by Louf was not that Louf would participate in the conduct of their business. It was, in fact, separate and distinct from any agreement which might have been in existence between Mallamaci and Zicarelli to that effect." The State also argues that neither Armellino nor Louf agreed to act in furtherance of the corruption of the other. And finally, "[s]ince neither agreed to commit the crime of conducting an illegal gambling enterprise, the parameters of their respective agreements with Zicarelli and Mallamaci were established by the crimes they each agreed to commit, but mutually excluded the crimes the other agreed to commit."
It is not necessary in a conspiracy that there be direct contact between all the parties to the conspiracy, nor need they all enter into it at one time. It is not even required that the members of a conspiracy have even heard of each other. State v. Carbone, 10 N.J. 329, 338 (1952); State v. Hutchins, 43 N.J. 85, 92 (1964), aff'd 44 N.J. 49 (1965). Nevertheless, in this case the evidence clearly indicates that Louf was aware of Armellino's being paid by Zicarelli for protection and that he was also aware of payments to other public officials. In our view, the State's position is a fallacious and illogical analysis of the respective crimes charged in the Armellino and Louf indictments. While it is true that both Armellino and Louf agreed to commit misconduct in *340 office, each did so, as the indictment against them alleged, to keep safe from investigation, detection and prosecution Zicarelli's gambling enterprise. That was the "agreement" which was the essence of the conspiracy and Armellino and Louf both joined in it in furtherance of its objective.
In State v. Yormark, 117 N.J. Super. 315 (App. Div. 1971), certif. den. 60 N.J. 138 (1972), modified 61 N.J. 202 (1972), cert. den. 407 U.S. 925, 92 S.Ct. 2459, 32 L.Ed.2d 812 (1972), it was held that separate conspiracies existed so as to bar the defense of double jeopardy after defendants had been acquitted at the first trial. In speaking of the conspiracy between defendants Perwin and Mulvaney in that case, and their claim of double jeopardy, this court said:
The agreements underlying the three conspiracies charged in the former trial were separate, distinct and different from that charged in the instant case. There was no evidence that the four agreements were tied together as stages in the formation of one larger, all-inclusive combination directed to achieving a single unlawful end result. On the contrary, each separate agreement had its own distinct illegal end  each goal was an end in itself, separate from the others. [Id. 117 N.J. Super. at 333; emphasis added].
Here the evidence was clear that the actions of both Armellino and Louf with Zicarelli and Mallamaci were "tied together" simply as stages in the formation of the one all-inclusive combination directed to securing protection for Zicarelli's gambling enterprise. The agreement of Armellino did not have "its own distinct illegal end  * * * an end in itself, separate from the others." Both Armellino and Louf knew of the broader extent of the Zicarelli conspiracy. In fact as we have said, the evidence showed that Louf was aware of Armellino's connection, that he in fact received payments in West New York, and at one point reported a possible gambling raid in that town, Armellino's bailiwick.
The dimensions of the conspiracy which the prosecutor was about to prove in this case were outlined by him in his opening to the jury. He charged that "Joseph Zicarelli controlled *341 an illegal gambling empire in Hudson County. * * * He was the boss, the ruler. Many towns were involved in the County of Hudson, the Town of West New York, Guttenberg, Secaucus, Bayonne, Union City and others." Further, "* * * [t]he evidence will show an illegal gambling enterprise * * * that Joseph Zicarelli owned part of Hudson County, and Louf * * * was one of the officials he owned. Louf was in a position as a superior officer in the County Prosecutor's Office to give advance warning of gambling raids when they involved Zicarelli's people and also to communicate general law enforcement intelligence information." And, "* * * when the flesh and skin is on this skeleton, you will see a figure standing before you which represents corruption in Hudson, and I will ask you at that time on behalf of the people of this State to react loudly and clearly. Thank you." (Emphasis added). And in the Armellino conspiracy trial the prosecutor said:
We have contended from the outset of the case that this is a broad conspiracy and Mr. Zicarelli's position in this conspiracy at the top is where he was responsible to a number of the political figures and that these political figures were really responsible to him, that there were a number of payments made to these individuals, one of which was the Mayor of West New York and we say that these parts of the conversation where there is an obvious discussion concerning payments to John by a [sic] Theurer, for example, are definitely and distinctly related to the object for which this conspiracy was formed and to the object of the conspiracy that is now on trial.
Clearly in both indictments the conspiracy had the same object, namely, to "keep safe from investigation, detection and prosecution an illegal gambling enterprise" which was controlled and supervised by Zicarelli. The area where protection was sought in this case was Hudson County, where Louf was a detective. West New York, the town where protection was bought in the Armellino case, was within Louf's area of influence and was specifically named in the Louf indictment as a place where he, Zicarelli and Mallamaci conspired. Two of the overt acts, payments of $100 each to Louf, *342 occurred in West New York. The period of the instant conspiracy (July 1, 1965 to April 8, 1970), spans that of the Armellino conspiracy (November 4, 1965 to April 8, 1970). On March 4, 1970, Louf, carrying out his assigned part in the conspiracy, told Policastro that a gambling raid might take place in West New York.
As said above, every witness who testified in this case testified in the prior trial. The testimony of the State's main witness, Policastro, as to Zicarelli's involvement was practically the same in both trials. The tape recordings of February 20 and March 9, 1970, conversations between Policastro and respectively, Zicarelli and Mallamaci, and that of April 6, 1970, involving Mallamaci and Fluccari, were all admitted in evidence in both trials. The tapes of March 4, March 31 and April 4, 1970 (conversations between Louf and Policastro) contain references to payments to Armellino or Theurer and evince Louf's knowledge of other public officials on Zicarelli's payroll.
We conclude that both the Armellino indictment and the instant one involved but a single overall conspiracy with Zicarelli as its "core" and Armellino and Louf its "spokes," i.e., mere instrumentalities working to fulfill the common purpose of protecting Zicarelli's gambling enterprise in Hudson County. Therefore the defense of double jeopardy provided by the Fifth Amendment of the United States Constitution vitiates the conviction of Zicarelli and Mallamaci on the "conspiracy" count of the indictment. The convictions on that count are therefore reversed and judgment of acquittal thereon is entered on behalf of said defendants. We do not reach those defendants' "due process" arguments resting on prosecution on this indictment after prosecution in the Armellino case.
Since testimony which was admissible only on the conspiracy count, and which would not have been admissible on the substantive counts (IV and V) against Zicarelli and Mallamaci, was admitted in the trial below, their convictions on said counts are also reversed and a new trial thereon is *343 ordered. We therefore need not reach said defendants' contentions here that their motions for acquittal on those counts should have been granted.
Though, because of the foregoing reversal, we need not pass on the remaining contentions of Zicarelli and Mallamaci, we do so, in the event of further review.

(2)

The court's charge
We find no merit in the contentions of defendants Zicarelli and Mallamaci that the court erred in its charge to the jury.

(3)

Admission of evidence of other crimes (raised by defendant Zicarelli)
In light of our holding that a single conspiracy was involved, evidence of payments by Zicarelli to other public officials would be admissible with respect thereto. But the issue is academic since double jeopardy bars prosecution of the conspiracy count. We do not pass upon the question as to whether such evidence will be admissible on the trial of the substantive counts. But see R. Ev. 55.

(4)

Summation of prosecutor and the court's action with respect to summation of counsel for defendant Zicarelli
We find no merit to Zicarelli's contentions that the prosecutor's summation was prejudicial nor in his contention that the court erred in sustaining an objection of the prosecutor during summation by Zicarelli's counsel. Nor do we find any abuse of discretion in the court's remarks with respect thereto.

*344 (5)

Permitting opinion by police gambling expert that, in a gambling enterprise such as here involved "payoffs" to public officials would be necessary to keep it going
The testimony of the State's expert, Lt. Herbert, was in rebuttal to testimony given by defendant Louf on cross-examination that "payoffs" would not necessarily be required for the continuance of a gambling enterprise as involved here. There was no objection to the question which elicited Louf's answer. The "door" was thus opened to the State expert's testimony, in rebuttal, that such "payoffs" were necessary to keep such an operation going. Expert opinion is not objectionable because it embraces the ultimate issue to be decided by the trier of fact. State v. Boiardo, 111 N.J. Super. 219, 238 (App. Div. 1970), certif. den. 57 N.J. 130 (1970). In any event, the opinion of the expert did not answer the ultimate issue here, i.e., the guilt or innocence of these defendants as to the issues framed in the indictment. We find no abuse of discretion in the admission of the expert's opinion.

(6)

ADDITIONAL CONTENTIONS OF DEFENDANT MALLAMACI

(a)

Motions for mistrial and for severance
We find no abuse of discretion in the denial of defendant Mallamaci's motions for a mistrial or for a severance.

(b)

Mallamaci's sentence
Mallamaci's convictions on all three counts having been reversed, the question of the excessiveness of his sentence is now moot and need not be considered.

*345 B.

AS TO DEFENDANT LOUF
We find it appropriate to note that our holding that the convictions of Zicarelli and Mallamaci must be set aside on the ground of double jeopardy does not affect Louf's conviction on the conspiracy count. There was sufficient evidence in support of his involvement in the conspiracy even though the conviction of his co-conspirators cannot stand. There was no prejudice as to Louf in the barring of prosecution of his co-defendants on double jeopardy grounds.
It is true that if defendants Zicarelli and Mallamaci had been acquitted on the merits as to the conspiracy count, and Louf alone were convicted thereon, his convictions could not stand. It could not then be said that he was a party to a conspiracy with Zicarelli and Mallamaci after they had been adjudicated not to have been parties thereto. 16 Am.Jur.2d Conspiracy § 33, p. 144; Annot. Conspiracy-Other Parties-Disposition, 91 A.L.R.2d 700, 705, § 3 (1963); Lubin v. United States, 313 F.2d 419 (9th Cir.1963); Herman v. United States, 289 F.2d 362 (5th Cir.1961), cert. den. 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961); State v. Collins, 120 N.J. Super. 48, 51 (Law Div. 1972).
But our reversal on double jeopardy grounds does not adjudicate that Zicarelli and Mallamaci did not participate in a conspiracy with Louf. It merely bars their prosecution for that conspiracy. By way of analogy, one of two co-conspirators may be convicted, although his co-conspirator has secured immunity from prosecution by becoming a witness for the prosecution. People v. Gilbert, 26 Cal. App.2d 1, 78 P.2d 770 (1938); People v. Bryant, 409 Ill. 467, 100 N.E.2d 598 (1951); Farnsworth v. Zerbst, 98 F.2d 541 (5th Cir.1938); United States v. Fox, 130 F.2d 56, 57 (3rd Cir.1942), cert. den. 317 U.S. 666, 63 S.Ct. 74, 87 L.Ed. 535 (1942); Annot. 91 A.L.R.2d 700, 721 (1963).
The rationale for such rule is stated as follows in Farnsworth v. Zerbst, supra:
*346 At least two persons must join in an unlawful enterprise to constitute it a conspiracy. * * * But both need not be prosecuted, or prosecutable. One may die, may escape, or obtain a pardon; but the other remains guilty.

* * * * * * * *
The rule that the acquittal of all save one of alleged conspirators results in the acquittal of all applies to acquittals on the merits. The reason of it is that such judgments prove that there was in fact no criminal agreement among two or more persons. [98 F.2d at 544; emphasis added].
And as stated in People v. Gilbert, supra:
It is only where one is convicted and another or others are acquitted, resulting in a repugnancy upon the record, that the only convicted conspirator may be discharged. Where, as in the instant case, the discharge of an alleged coconspirator is not inconsistent with his guilt, but simply bars a subsequent prosecution of him, it does not invalidate the conviction of his coconspirators. [78 P.2d at 783].
The philosophy which would exculpate a co-conspirator who alone may stand convicted while his co-conspirator was acquitted is "not applicable where no disposition on the merits has been made of the charges against the other accused * * *." State v. Goldman, 95 N.J. Super. 50, 52 (App. Div. 1967). So here, the reversal of the convictions of Zicarelli and Mallamaci on double jeopardy grounds is not an "acquittal on the merits" and is not inconsistent with their guilt, but rather simply bars their subsequent prosecution. Therefore there is no repugnancy on the record and Louf's conviction stands.

(1)

Louf's contentions
Among the contentions of defendant Louf are that (1) the court erroneously permitted testimony concerning conspiracies separate from that set forth in the instant indictment, and (2) the designation of venue in Burlington County was improper and the procedure in doing so violated his rights to due process under the Fifth and Fourteenth Amendments *347 of the United States Constitution. We find no merit in such contentions and incorporate herein by reference our opinion in State v. Zicarelli, supra, 122 N.J. Super. 225, dealing with similar contentions.

(2)

The court's charge as to the elements of crime of bribery
Defendant Louf contends that the court erred in charging with respect to the crime of bribery as follows:
It is not essential to the commission of the crime that there have been actual payments; the crime is complete upon the mere offer.
It is true that if that part of the charge were applicable to defendant Louf (i.e., that all the State would have to prove was that a bribe had been offered to him, but that no payment had been proved), the charge would be erroneous as to common law bribery. State v. Begyn, 34 N.J. 35, 48 (1961). But the foregoing excerpt from the charge is taken out of context. In context it plainly refers to defendants Zicarelli and Mallamaci.
Further, the court at a prior point in its charge had instructed:
Before you can find the defendant Ray R. Louf guilty on either of the bribery count charges against him, you must find what the State has proven beyond a reasonable doubt that the defendant, Louf, received some money or undue reward in his capacity as Captain of Hudson County Detectives, to influence his behavior in office and to incline him to act contrary to the known rules of honesty and integrity as is charged in Counts two and three of the indictment.
Clearly then, taken as a whole, the charge stated that an essential element of the crime of bribery  as to defendant Louf  was that there be proof beyond a reasonable doubt that he "received some money or undue reward." Defendant's criticism of the charge is not well taken.

*348 (3)

Vulgarities in the recordings
Louf next contends that he was prejudiced by the court's failure to delete several vulgarities uttered by him and defendant Zicarelli in the course of the recorded conversations. The vulgarities mentioned were themselves evidential of Louf's state of mind and attitude toward his own police duties and his opinion of other enforcement officials, dedicated to fulfillment of their duties. In any event, failure to delete the offensive words were matters within the discretion of the trial judge. He soundly exercised that discretion.

(4)

Conversations concerning a separate crime
Defendant Louf here complains of a reference in a recorded conversation between him and Policastro to alleged jury tampering with respect to a case involving one Liebhardt. Liebhardt was an underling of one "Skootch," Zicarelli's Bayonne representative. The evidence was relevant to show Louf's knowledge of Zicarelli's aides and, perhaps, a community of interest with him. We find no error or abuse of discretion in the admission of the Liebhardt reference.

(5)

Alleged limitation of cross-examination of Policastro
It is contended that Louf's counsel was unduly limited in his cross-examination of Policastro (1) as to certain federal tax liens which had been filed against him and his detective agency, (2) alleged discrepancies between Policastro's testimony at a previous trial and before the Grand Jury, and (3) with reference to a case concerning a Dr. Raymond.
*349 As to the question of tax liens, Policastro admitted that he owed taxes to the Federal Government and acknowledged existence of the liens. The alleged discrepancy in his testimony related to whether he had been on the police force 18 years or 23 years  an immaterial difference. The court's ruling as to the Dr. Raymond case was made in an effort to avoid confusion as to dates. The limitation of cross-examination is a matter within the sound discretion of the trial court. We find no abuse of that discretion here.

(6)

Defendant Louf's sentence
It is here claimed that, in view of Louf's prior good record, the three consecutive sentences on each of the three counts on which he was convicted were excessive. Louf solicited Zicarelli to put him on his "payroll." In addition, though only two $100 payments to him were alleged as overt acts, the proof was clear that he was thus "employed" from 1963 to March 1970. Separate sentences may be imposed for a conspiracy and the substantive crimes growing therefrom. State v. Oats, 32 N.J. Super. 435, 439-440 (App. Div. 1954). Under these circumstances we cannot find an abuse of discretion in the sentences imposed.
The judgments of conviction as to defendant Louf are in all respects affirmed.
NOTES
[1] Sua sponte this court has ordered the consolidation of the appeals in State v. Louf and Mallamaci (A-238-71 and A-297-71), with State v. Zicarelli (A-2134-71).
[2] It is necessary to particularize the details of the indictment because of the defense of "double jeopardy" here urged.
[3] The Roman numerals ascribed to the contentions of the respective parties are the numbers of the points raised in their respective briefs.
[4] Counsel for defendant Zicarelli contended that the motion based on claim of double jeopardy would not be appropriate until the evidence was in. Without deciding the propriety of that contention, we consider that position was not unreasonable under the circumstances of this case and prefer to treat the contention on the merits as to both Zicarelli and Mallamaci.
[5] In that area, the "gross take" in the gambling operation amounted to $40,000 and $42,000 per day.
[6] Klein and Theurer were named with Zicarelli and Mallamaci in separate indictments. Theurer pleaded guilty. State v. Theurer, 62 N.J. 64 (1972). Sarubbi was not indicted.