Joseph ZICARELLI, Appellant,

v.

Albert D. GRAY, Jr., Superintendent,
New Jersey State Prison.

No. 75–1173.

United States Court of Appeals,
Third Circuit.

Argued Sept. 4, 1976.

Reargued May 14, 1976.

Decided Sept. 10, 1976.

Jonathan L. Goldstein, U. S. Atty., Newark, N.J., for amicus curiae; John J. Barry, Asst. U. S. Atty., Newark, N.J., on brief.

Argued Sept. 4, 1975.

Before VAN DUSEN, ADAMS and HUNTER, Circuit Judges.

Reargued May 14, 1976.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS and GARTH, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Trial by jury is one of several important protections standing between persons accused of crime and the weighty power of the state to punish those convicted of having committed crime. The right to trial by jury is provided for within the Constitution as originally adopted[1] and in the Bill of Rights as well.[2] It has been guaranteed for federal and state prosecutions since the early days of the Republic.[3] Indeed, the right has been characterized as "fundamental to the American scheme of justice . . . ." [4]

Not only must the trial promised by the Constitution take place before a jury, but it must be a speedy and public trial, and the jury must be impartial. At least in federal prosecutions, it is necessary that the jury be drawn from the state and from the federal judicial district in which the crime was committed, and the district from which the jury is chosen must have been previously ascertained by law.[5] These additional safeguards, which go far in establishing the nature of the jury trial the accused shall

Isles & Weissbard, Montclair, N.J., for appellant; Harvey Weissbard, Montclair, N.J., on brief.

William F. Hyland, Atty. Gen. of New Jersey, Trenton, N.J., for appellee; Howard E. Drucks, Deputy Atty. Gen., Div. of Crim. Justice, App. Section, East Orange, N.J., of counsel and on the petition.

1. U.S.Const. art. III, § 2.

2. U.S.Const. amend. VI.

3. The right was statutorily guaranteed for federal trials by the Judiciary Act of 1789. Act of Sept. 24, 1789, ch. 20, § 29, 1 Stat. 88. The constitutions of all 13 of the original states also guaranteed trial by jury. Blume, *The Place of Trial of Criminal Cases; Constitutional Vici-*

*nage and Venue*, 43 Mich.L.Rev. 59, 68, 70, 72–73 (1944); *see* 2 Hofstra L.Rev. 415, 425–426 & nn. 66–77 (1974).

4. *Duncan v. Louisiana,* 391 U.S. 145, 149, 88 S.Ct. 1444, 1447, 20 L.Ed.2d 491 (1968).

5. U.S.Const. amend. VI.

have, find their origin both in the English common law and in America's own pre-revolutionary experience. For example, the right to be tried by a jury from a particular geographical region, or vicinage, came in part from the practice established in England by the early 1600's, and in part as a reaction to the efforts of the English Crown during the 1760's to bring colonists to London in order to try them for treason.[6]

Although the concept of a trial by a jury drawn from a specific geographical area lies at the core of this appeal, we must first ascertain the contours of the doctrine of exhaustion under the facts in the present controversy. Then we must determine whether the constitutional rights of a defendant in a state prosecution are violated when he is indicted for crimes arising out of acts occurring in one county of the state, and is subsequently tried before a jury drawn exclusively from a second county in the state.

### A.

Joseph Zicarelli is currently in custody as a result of two sentences imposed by the courts of New Jersey.[7] Leading to these two convictions were Zicarelli's alleged efforts to protect from prosecution an illegal gambling operation that he controlled in West New York, Hudson County, New Jersey. The convictions were based upon the last two indictments in a series of seven naming Zicarelli as one of the defendants. Each of the seven was returned by a grand jury which, under the applicable New Jersey statute,[8] had statewide investigative jurisdiction.

The first of the seven indictments charged that Zicarelli and others had committed a criminal offense in Hudson County. Of the next four indictments, two specified offenses occurring in Hudson County only, one charged offenses in Hudson and Mercer Counties, and one charged offenses in Hudson, Bergen, and Burlington Counties. The crimes set forth in the sixth and seventh indictments occurred in Hudson County and "elsewhere," although the particular acts they referred to were claimed to have taken place in Hudson County alone. The indictments which led to the convictions under review in this Court today charged Zicarelli and others with a conspiracy to corrupt a public official, and with the substantive offenses of bribery of a public official and corruptly aiding, abetting, and causing the payment of bribes.

Under the New Jersey statute that established a statewide grand jury procedure, the venue of trials resulting from indictments returned by such a grand jury is designated by an assignment judge, who is appointed by the Chief Justice of New Jersey.[9] The venue of the first indictment was initially laid in Hudson County. Trial on the next five indictments was set by the assignment judge for Mercer County. The Attorney General of New Jersey subsequently filed an *ex parte* petition with the assignment judge, seeking to move the trial on the first

---

6. Blume, *supra* note 3, at 60–66. The great concern of the First Continental Congress with the practice of the English Crown of trying colonists was shown in its resolve of October 14, 1774. The Continental Congress there stated that "the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." Further evidence of the colonists' interest in the right to trial by a jury of the vicinage is found in the Declaration of Independence, in which a complaint was made about the King's practice of "transporting us beyond Seas to be tried for pretended offenses." *Duncan v. Louisiana,* 391 U.S. 145, 152, 88 S.Ct. 1444, 1449, 20 L.Ed.2d

491 (1968). *See also* Connor, *The Constitutional Right to a Trial by a Jury of the Vicinage,* 57 U.Pa.L.Rev. 197, 198–99 (1909).

7. Zicarelli is presently serving two concurrent sentences. The first of these, for a term of 12–15 years, was imposed upon his conviction on one count of conspiracy and six counts of aiding and abetting the bribery of a public official. The second sentence is for a term of 4–5 years imposed upon Zicarelli's conviction on two counts of aiding and abetting the bribery of a public official.

8. N.J.S.A. 2A:73A–1 to –9 (1976).

9. *Id.* §§ 73A–2, 8.

indictment from Hudson to Mercer County. An order effecting that change was entered without notice to the defendants.

Subsequent to that transfer of venue, but before the seventh indictment had been returned, the Attorney General filed another petition, again *ex parte*, this one seeking to move to Burlington County the trial of the six indictments that had then been returned. Three grounds were asserted in support of the petition: Zicarelli was incarcerated in Burlington County; the principal prosecution witness, Peter Policastro, was in personal danger, and his security and safety could be adequately met in Burlington County; and all six indictments involved common questions of law and fact that could best be disposed of by a single judge. Again without notice to the defendants, the assignment judge entered an order redesignating venue in Burlington County.

Following that change of venue, the seventh indictment was filed, and venue on that indictment was set for Burlington County also.

Shortly thereafter, the defendants moved for an order redesignating venue in Hudson County. The motion was denied, without a hearing, by the judge to whom the cases had been assigned for trial. When the defendants appealed, the New Jersey Supreme Court remanded the matter to the original assignment judge in order to provide the defendants an opportunity to be heard on the matter of venue.[10]

After a full hearing, the assignment judge held that Burlington was a proper county for purposes of venue. Among the reasons set forth by the court to justify the transfer to Burlington County were the following: the security of Policastro could be better maintained in Burlington County; the sixth amendment to the United States Constitution did not prohibit the laying of venue in Burlington County; there would be less publicity in Burlington County than in Hudson County; there would be an impartial jury in Burlington County that would give defendants a fair trial; and a judge and a courtroom were available for the trial in Burlington County.

The trial was held in Burlington County, and the jury was drawn solely from that county.[11] Zicarelli was convicted of several of the counts contained in the last two of the indictments, and was sentenced to two separate terms, which were to be served concurrently.

Zicarelli's first conviction was affirmed by the New Jersey Superior court,[12] and the second conviction was initially reviewed by the Superior Court,[13] and ultimately upheld by the New Jersey Supreme Court.[14]

Zicarelli subsequently petitioned the federal district court for a writ of habeas corpus. Most relevant to our present review are the allegations in the petition that Zicarelli's constitutional rights were violated when he was tried by a jury selected from residents of a county other than the one in which the alleged crimes were committed,[14a]

---

10. The New Jersey courts have approved the technique employed here, by which the venue question may be decided anew after venue is designated by the assignment judge. *State v. Mullen*, 126 N.J.Super. 355, 358, 314 A.2d 394, 396 (App.Div.1974) (per curiam).

11. N.J.S.A. 2A:70–1, 71–1, 2 (1976).

12. *State v. Zicarelli*, 122 N.J.Super. 225, 300 A.2d 154 (App.Div.), *certif. denied*, 63 N.J. 252, 306 A.2d 455, *cert. denied*, 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973).

13. *State v. Louf*, 126 N.J.Super. 321, 314 A.2d 376 (App.Div.1973).

14. 64 N.J. 172, 313 A.2d 793 (1973) (per curiam).

14a. It was also alleged in Zicarelli's petition for habeas corpus that the *ex parte* procedure for allocating venue violated his due process rights; that the trial court improperly refused to ask the trial jurors whether they had been exposed to any publicity concerning the case; and that he was denied due process when he was tried on charges of conspiracy and of bribery after having previously been tried on related substantive counts flowing from a single overall conspiracy. Zicarelli has further argued that the arrangement whereby venue is designated before the propriety of a particular designation may be questioned, *see* note 10 *supra*, improperly shifts the burden of proof.

and that he was denied the right to trial by a jury comprising a representative cross-section of the locale where the crimes took place. The district court refused to grant the writ.

Upon Zicarelli's appeal from that order, a panel of this Court reversed the district court's judgment, and remanded the case with the instruction that the writ should issue unless the state granted Zicarelli a new trial before a jury selected in accordance with the guidelines set forth by the panel. In essence, the panel held that the sixth amendment requires that the jury venire must represent a cross section of the community where the crime was committed, and that the state breached that guarantee by trying Zicarelli before a jury chosen from a venire that did not include residents of the area where the crime occurred and that was demographically dissimilar to the citizenry of that area.

The State of New Jersey then petitioned for a rehearing before the Court en banc, and an amicus brief was filed by the United States, supporting the petition. In view of the importance of the constitutional issues presented by the case, rehearing en banc was granted, and as a result, the opinion and judgment of the panel were vacated.

After full consideration of the questions presented, we have determined that the judgment of the district court must be affirmed, though without prejudice to the institution by Zicarelli of further proceedings in regard to two of his sixth amendment claims.

### B.

Before we may move to Zicarelli's substantive arguments, we are required by the habeas corpus statute [15] to determine whether he has exhausted his state remedies regarding them.

Zicarelli brought two separate contentions to the Court en banc in his efforts to obtain release from custody, both coming within the general ambit of the sixth amendment. The first is that the trial before a jury drawn from Burlington County violated his right to be tried by a jury composed of residents of the county where the crime was committed; the second is that the procedures employed by the state in assembling the jury violated the cross-section concept of the sixth amendment.[15a] A third proposition, raised for the first time during oral argument before the en banc Court, is that the "district" from which the trial jury was chosen was not previously ascertained by law, as required by the sixth amendment.

While it was questioned whether the argument based upon the exclusion of Hudson County residents from the trial jury was brought to the attention of the state courts, Zicarelli's counsel stated at oral argument here, and the state's Deputy Attorney General agreed, that the issue had been raised before the New Jersey Supreme Court during the pendency of the appeal in State v. Louf, a companion case.[16]

---

**15.** The statute provides that "[a]n application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State . . . ." 28 U.S.C. § 2254(b) (1970).

**15a.** The sixth amendment does not by its terms include such a requirement, but in cases where blacks and women were systematically excluded from juries, the Supreme Court has held that the trial jury must be representative of a cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (women); *Peters v. Kiff*, 407 U.S. 493, 500, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (plurality opinion) (blacks). *See Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

**16.** 64 N.J. 172, 313 A.2d 793 (1973) (per curiam). It was agreed at oral argument that counsel for one of Zicarelli's codefendants had sent a letter to the New Jersey Supreme Court referring to the decision of the California Supreme Court in *People v. Jones*, 9 Cal.3d 546, 108 Cal.Rptr. 345, 510 P.2d 705 (1973). A copy of such letter of transmittal has been supplied by Zicarelli's counsel, and is attached to this opinion and marked Appendix II. Moreover, Zicarelli's counsel submitted an affidavit to the federal habeas corpus court (Appendix III) indicating that the *Jones* opinion was relied upon for the venue claim.

There is serious doubt, however, whether the cross section claim was properly presented in any form to the state courts. It does not appear to have been advanced to the trial court or the New Jersey Superior Court,[17] but the issue may have been arguably adverted to in the New Jersey Supreme Court by way of reference to a California case, entitled *People v. Jones,*[18] which had been decided while Zicarelli's appeal was pending before the New Jersey Supreme Court. Zicarelli takes this position because the *Jones* opinion discusses the cross-section as well as the venue aspects of the sixth amendment.[19] It is abundantly clear, however, that the previously-ascertained-by-law issue was not brought to the attention of the state courts. Rather, it was raised sua sponte by this Court *en banc.*

At oral argument, counsel for New Jersey declared that the state was not pressing the exhaustion issue before this Court because he believed that the submission of the *Jones* opinion to the New Jersey Supreme Court was sufficient to satisfy the exhaustion requirements of the statute.[20] This "concession," however, is not dispositive of the issue. First, counsel's statement indicates that he took the transmittal of the *Jones* opinion to constitute exhaustion as to *all* sixth amendment claims, and did not consider its impact on the separate contentions that are discrete, and in some respects disparate, parts of the sixth amendment.[21] Second, the doctrine of exhaustion is a product of the recognized need for coordination and friction-free relations between separate court systems.[22] We have been unable to discover any case where a mere statement from counsel, even from a prosecutor, has been found sufficient to dispose of the element of exhaustion without an independent judicial inquiry.[23]

In analyzing the exhaustion requirement, we must, as a threshold matter, determine whether exhaustion is essential as to each

Research after oral argument revealed that Zicarelli's brief filed in the Superior Court of New Jersey contained an argument that the sixth amendment guarantees the accused the right to a trial by a jury in the county where the crime was committed. Brief for Appellant at 23–28, *State v. Zicarelli,* 122 N.J.Super. 225, 300 A.2d 154 (App.Div.1973).

17. Zicarelli's brief in the New Jersey Superior Court does make mention of the differing demographic make-ups of Burlington and Hudson Counties. *See* Brief for Appellant at 23. *State v. Zicarelli,* 122 N.J.Super. 225, 300 A.2d 154 (App.Div.1973). This discussion, however, was presented in the analysis of a New Jersey statutory issue. The portion of the brief concerning the sixth amendment issues made no mention of the demographic data or the cross-section requirement itself. *See id.* at 23–28.

18. *See* note 16 *supra.*

19. *See People v. Jones,* 9 Cal.3d 546, 108 Cal. Rptr. 345, 510 P.2d 705 (1973).

20. Counsel stated:
As the court knows, we originally raised the issue of the exhaustion before the district court. The court held that our position was without merit. When the time came to apply to this court, we considered all the facts. The facts that in fact there had been a letter citing to *People v. Jones* which had been submitted to the State Supreme Court and at oral argument, a reference had been made to that particular case. And we felt that in all

fairness, it had been, as the courts require, fairly presented to the highest state court. The portions of the transcript of the oral argument before the Court en banc that addressed the exhaustion question are set forth in Appendix 1 to this opinion.

21. A fair reading of the transcript of the oral presentation of counsel for the State, *see* note 20 *supra,* indicates that he was not aware of the requirement that distinct claims be individually exhausted, a requirement that was established by the Supreme Court's opinion in *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). *See* p. 472 *infra.*

22. *See, e. g., Picard v. Connor,* 404 U.S. 270, 275–76, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Ex parte Royall,* 117 U.S. 241, 251–52, 6 S.Ct. 734, 29 L.Ed. 868 (1886); Developments in the Law—Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1093–94 (1970).

23. Indeed, several courts of appeals have held that they will examine the issue of exhaustion regardless of whether the parties have raised it. *See, e. g., United States ex rel. Johnson v. Vincent,* 507 F.2d 1309, 1312 (2d Cir. 1974), *cert. denied,* 420 U.S. 994, 95 S.Ct. 1435, 43 L.Ed.2d 678 (1975); *United States ex rel. Wissenfeld v. Wilkins,* 281 F.2d 707, 710 (2d Cir. 1960). *See also USA ex rel. Melvin Sanders v. Arnold,* 535 F.2d 848 (CA3 1976) at p. 850, involving exhaustion of administrative remedies.

of the sixth amendment issues, or whether the raising of a single sixth-amendment jury-related argument in the state courts allows the federal courts to review habeas claims based upon *any* sixth amendment jury contention.

The distinction between these two approaches is not an insignificant one. As the Supreme Court recently observed in *Stone v. Powell*,[24] which was decided after the present case was argued before this Court, collateral review of state-court convictions by the federal courts, while certainly needed as a final safeguard against unconstitutional losses of liberty, nevertheless "results in serious intrusions on values important to our system of government."[25] Among those values are "the minimization of friction between our federal and state systems of justice, and . . . the maintenance of the constitutional balance upon which the doctrine of federalism is founded."[26]

█ Interpretation of the breadth of the statutory exhaustion requirement thus implicates important considerations. *Stone* highlights the necessity for a searching scrutiny by the federal habeas court of the points that were raised in the state tribunals, in order to ensure that the state system was granted a fair opportunity to confront arguments that are propounded to the federal habeas courts.

The Supreme Court's decision in *Picard v. Connor*[27] provides the initial step in our analysis. Connor had contended to the state courts that his state-court conviction was invalid because the prosecution had not been instituted as a result of an indictment

returned by a grand jury. He claimed that the grand jury clause of the fifth amendment had been incorporated within the due process clause of the fourteenth amendment, thus making it applicable to the states. This argument was rejected by the state courts, and Connor petitioned for federal habeas relief. A separate equal protection claim was suggested for the first time in the federal courts.[28] The Supreme Court reversed the court of appeals, ruling that a federal habeas court may not entertain an issue presented to it unless the "same claim" had been urged upon the state courts. In order to meet this standard, the Supreme Court stated that the argument brought before the federal court must be "the substantial equivalent" of a claim already presented to the state courts; "the substance of" the claim raised in the federal court must first have been submitted to the state court.[29] Following these guidelines, the Supreme Court held that state-court remedies had not been exhausted by Connor with regard to the equal protection contention.

Later decisions of the Supreme Court are helpful in clarifying the scope of the word "claim" in determining whether a contention has first been tendered to the state courts for purposes of exhaustion. The Court has observed that the "method of analysis" asserted in the federal court must have been "readily available to the state court."[30] It has held that the petitioner must give the state system the opportunity to resolve the federal constitutional "issues" before he goes to the federal court for habeas relief.[31] Following the *Picard* doc-

---

24. —— U.S. ——, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

25. *Id.* at —— n. 31, 96 S.Ct. at 3050.

26. *Id.*

27. 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

28. The equal protection claim had actually been suggested by the United States Court of Appeals during its review of the district court's denial of the writ. Connor did press it before the United States Supreme Court, however. *Id.* at 271, 276–77 & n. 9, 92 S.Ct. 509.

29. *Id.* at 277, 278, 92 S.Ct. 509.

30. *Stanley v. Illinois*, 405 U.S. 645, 658 n. 10, 92 S.Ct. 1208, 1216, 31 L.Ed.2d 551 (1972) (dictum).

31. *Francisco v. Gathright*, 419 U.S. 59, 63, 95 S.Ct. 257, 42 L.Ed.2d 226 (1974) (per curiam). In *Francisco*, the Supreme Court held that the "issue" raised by the petitioner in the federal habeas court had been exhausted in the state courts. The intervention of a decision by the state supreme court that arguably would have afforded the petitioner relief in the state courts was held not to preclude federal habeas review.

trine, the Second Circuit has ruled that an argument that an arrest warrant was insufficient is "different in substance" from a contention that there was no probable cause for the arrest, although both claims are encompassed by the fourth amendment.[32]

■ In view of the criteria that have been developed to ascertain whether a contention has been exhausted at the state level, the argument based upon the exclusion of Hudson County residents from the jury venire would appear to be sufficiently distinct from the cross-section claim and the previously-ascertained-by-law contention, at least in the context of this case, so as to lead to the conclusion that exhaustion of state-court remedies with regard to the first point does not constitute exhaustion with regard to the others.

We recognized that the venue and cross-section requirements have areas of intersection and trace their roots, in some respects, to the same historical sources. But these factors are outweighed by the differences between the two separate aspects of the sixth amendment, especially the distinction between the broadly geographical "method of analysis" included in the venue aspect of the sixth amendment and the essentially demographic inquiry mandated by the cross-section claim.[33] Moreover, while the venue and previously-ascertained-by-law components are explicitly set forth in the sixth amendment, the cross-section concept is not. It thus does not appear that each of these three aspects of the sixth amendment constitute "the same claim" or are substantially equivalent for purposes of the exhaustion question.[34]

The second phase of our analysis is directed to the question whether Zicarelli has exhausted his state-court remedies as to each of his sixth amendment contentions.[35] As we have already indicated, it is clear that he has sufficiently presented his venue claim to the state courts whereas it is equally apparent that he has failed to do so as to the previously-ascertained-by-law argument. The cross-section claim, however, provides a more difficult issue—whether a mere transmittal of the *Jones* opinion to the New Jersey Supreme Court and then a ref-

See also *Pitchess v. Davis*, 421 U.S. 482, 487, 95 S.Ct. 1748, 44 L.Ed.2d 317 (1975) (per curiam); *Fuller v. Oregon*, 417 U.S. 40, 58, 94 S.Ct. 2116, 40 L.Ed.2d 642 (1974) (Douglas, J., concurring in the judgment). Within the contours of a particular argument, however, not every detail need have been put before the state court in order to present all facets of the argument to the federal court on a petition for habeas. *Smith v. Goguen*, 415 U.S. 566, 576–77, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974) (dictum). *Accord, United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 173 (3d Cir. 1976); *Lamberti v. Wainwright*, 513 F.2d 277, 283 (5th Cir. 1975); *Bryant v. Caldwell*, 484 F.2d 65, 66 (5th Cir. 1973), *cert. denied*, 415 U.S. 981, 84 S.Ct. 1572, 39 L.Ed.2d 878 (1974).

**32.** *Mayer v. Moeykens*, 494 F.2d 855, 858 (2d Cir.), *cert. denied*, 417 U.S. 926, 94 S.Ct. 2633, 41 L.Ed.2d 229 (1974).

**33.** *Compare* pp. 479–483 *infra* (venue requirement) with *Taylor v. Louisiana*, 419 U.S. 522, 525–33, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975) (cross-section requirement) *and Peters v. Kiff*, 407 U.S. 493, 500–03, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972) (same).

**34.** The analysis suggested by the Supreme Court decisions that follow *Picard* forecloses us from concluding that the raising of one sixth amendment issue in the state courts provides exhaustion with regard to all others. Such a result is also indicated by *Picard* itself, where the prisoner was held not to have exhausted remedies on one fourteenth amendment claim, although he had on another. *See also Mayer v. Moeykens*, 494 F.2d 855, 858 (2d Cir.), *cert. denied*, 417 U.S. 926, 94 S.Ct. 2633, 41 L.Ed.2d 229 (1974) (different aspects of the fourth amendment).

**35.** In pursuing this inquiry, we assume that a remedy was available through the state courts on Zicarelli's cross-section and previously-ascertained-by-law claims at the time he petitioned the district court for a writ of habeas corpus, and nothing brought to our attention indicates otherwise. *See* New Jersey Court Rule 3:22 (post-conviction relief). *But see* R. 3:22–12. When there is no procedure available in the state courts to raise the question presented, exhaustion of state remedies is not required, on the ground that it would, under the circumstances, be unavailing, 28 U.S.C. § 2254(c). *See Humphrey v. Cady*, 405 U.S. 504, 516, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *Picard v. Connor*, 404 U.S. 270, 272 n. 3, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

erence to that opinion in oral argument in a companion case is adequate to constitute exhaustion.

*Picard* makes manifest that for there to be exhaustion "the federal claim must be *fairly* presented to the state courts." [36] We seriously doubt whether the transmittal of the *Jones* opinion to the New Jersey Supreme Court, followed by a brief reference to that opinion in oral argument, is sufficient to meet this test. While *Jones* does discuss the cross-section requirement,[37] it is a somewhat ambiguous opinion [38] in that it often combines discussion of the venue and cross-section aspects of the sixth amendment. And given the fact that Zicarelli's state court briefs deals with the venue issue while wholly ignoring the cross-section contention,[39] it does not appear that the mere reference to the *Jones* opinion fairly presented the cross-section claim to the New Jersey courts, and thus failed to satisfy the exhaustion requirement.

█ Moreover, we believe that Zicarelli's failure to provide, or to offer to provide, a factual predicate for his cross-section claim at any stage in the New Jersey proceedings casts a further shadow on whether he has fairly presented that argument to the state courts. For a court to determine a claim that a defendant has not been tried by a jury reflecting a cross-section of the community where the crime was committed, it must be apprised not only of the legal contention, but also of the demographic data supporting the contention. Zicarelli did not make such a proffer to the trial court, nor did he state to the appellate courts that he

was ready to present such information to the trial court if the cause was remanded for such purposes. Indeed, the first clear reference to the demographic data was made in Zicarelli's brief that was filed in the federal court to support his petition for habeas corpus.[40]

While the Supreme Court reserved the issue in *Picard*,[41] many courts of appeals have held that state-court remedies are not exhausted if a party submits factual allegations in support of his claim to the federal courts that he has not made to the state courts.[42] Indeed, the case for non-exhaustion is stronger here. In the cited cases, petitioners had presented some supporting facts to the state courts and later attempted to advance different and more compelling factual allegations to the federal courts.[43] Here, in contrast, Zicarelli failed to raise *any* of the relevant factual allegations, and instead delayed their initial presentation to his hearing in federal court.

█ Thus, what Zicarelli's position comes down to in regard to whether he has exhausted the cross-section argument at the state level is this: Although he made no reference to the cross-section claim in his briefs, although he provided no factual basis for a cross-section contention and indeed did not offer to establish such a predicate, the mere reference by counsel for a codefendant to an opinion of a California court which discussed the cross-section point together with the venue argument is sufficient to meet the Supreme Court test. Such an arrangement hardly seems to conform to the Supreme Court criteria of "fair-

---

**36.** 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971) (emphasis added).

**37.** *See People v. Jones,* 9 Cal.3d 546, 549–50, 551, 552, 556, 108 Cal.Rptr. 345, 348, 349–50, 352, 510 P.2d 705, 708, 709–10, 712 (1973).

**38.** *See People v. Jones,* 9 Cal.3d 546, 561, 108 Cal.Rptr. 345, 356, 510 P.2d 705, 716 (Burke, J., dissenting).

**39.** *See* Brief for Appellant at 23–28. *State v. Zicarelli,* 122 N.J.Super. 225, 300 A.2d 154 (App.Div.1973).

**40.** *But see* note 17 *supra.*

**41.** 404 U.S. 270, 276, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

**42.** *See, e. g., United States ex rel. Rogers v. La Vallee,* 463 F.2d 185, 187 (2d Cir. 1972); *Gurule v. Turner,* 461 F.2d 1083, 1084 (10th Cir. 1972); *Daniels v. Nelson,* 453 F.2d 340 (9th Cir. 1972); *United States ex rel. Boodie v. Herold,* 349 F.2d 372 (2d Cir. 1965).

**43.** *See, e. g., Gurule v. Turner,* 461 F.2d 1083, 1084 (10th Cir. 1972).

ly presenting" an issue. Nor does it appear to satisfy the comity rationale that undergirds the exhaustion rule.

In any event, even assuming arguendo that Zicarelli has exhausted his state-court remedies on the cross-section issue, given the posture of the case as a whole, he should nevertheless make his cross-section claim in the state courts. This would appear to be so since Zicarelli must present a factual basis to a trial court in support of his cross-section contention. And inasmuch as his previously-ascertained-by-law argument must be heard in a state court, in view of the fact there was admittedly no exhaustion on that point,[44] it would best serve the interests of judicial economy and efficiency for Zicarelli to present his cross-section claim at the same time. Otherwise, the previously-ascertained-by-law claim would be proceeding in the state court and the cross-section claim would be proceeding in the federal court concurrently, or else the federal court would have to stay its deliberations until the other court has completed its inquiry.

We now proceed to review the claim that was submitted to the state courts for their consideration, namely, that Zicarelli's sixth amendment rights were abridged when residents of Hudson County were omitted from the trial jury. We do so by first reviewing the history of the sixth amendment, and then by examining the decisions that have dealt with the question whether citizens residing in the area where the crime was committed may be excluded from the jury.

### C.

Until the early eighteenth century, jurors for English trials were drawn from the neighborhood, or vicinage, in which the alleged infraction had occurred. The theory of the time was that such jurors would have personal knowledge of the events at issue and in some cases might even investigate the facts. It was only gradually that the English law allowed the introduction of evidence for proof of facts, and not until the late eighteenth century that the jurors were expected to decide the case solely on the grounds of evidence introduced in court.

Jurors who were to adjudicate cases on the basis of their own knowledge could not ordinarily try a crime that had been committed in a neighborhood other than their own. As the practice of introducing evidence in court broadened, however, the need for the jurors to have personal knowledge of the events became less significant. Because of the shift, the geographical area from which the jury was summoned was expanded to include the county at large, and was no longer limited to a particular neighborhood. But even as the Parliament passed laws allowing the trial of certain crimes in counties adjacent to those in which they occurred, and of others at a central location such as London, the concept of the jury of the vicinage remained an important general rule for the trial of criminal cases.[45]

The principle of trial by a jury of the vicinage was not brought across the Atlantic Ocean from England in any absolute form. In fact, only five of the original

---

**44.** There are additional reasons for our declining to decide the previously-ascertained-by-law issue. Whether that clause is "essential" to the concept of a jury trial, and therefore applicable to prosecutions by the states, *see Apodaca v. Oregon*, 406 U.S. 404, 410, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (plurality opinion); *Williams v. Florida*, 399 U.S. 78, 99–100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), is a threshold question that appears to be one of first impression. *Cf. People v. Jones*, 9 Cal.3d 546, 550–51, 108 Cal.Rptr. 345, 348–49, 510 P.2d 705, 708–09 (1973) (holding that the state-and-district clause is applicable to the states). We do not

believe that it would be appropriate for an appellate court to confront this novel constitutional issue without the sharpening that proceedings in a trial court would provide. In addition, it is possible that the New Jersey courts might find a provision in New Jersey constitutional or statutory law similar to the previously-ascertained-by-law clause, thus obviating the need to pass on the federal constitutional issue. *Cf. Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**45.** Blume, *supra* note 3, at 60–63.

thirteen colonies established constitutional limitations on the geographical region from which the trial jury could be drawn. Two of these referred to the trial of facts where they arose; two referred to trial in the county where the crime occurred; and one referred to a jury of the vicinage, although this last may have actually meant only a jury drawn from the state as a whole.[46] Nor did the federal Constitution, as originally adopted, specifically guarantee the common law practice of a jury of the vicinage. Article III states only that "[t]he Trial of All Crimes . . . shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed."[47] Thus, in its original form, the federal Constitution "provided for venue [but], it did not impose the explicit juror-resident requirement associated with the concept of 'vicinage'."[48]

Concern that the wording of article III did not guarantee the right to trial by a jury of the vicinage led Congress to give the matter serious attention at an early date. The vicinage concept was one of several upon which Congress deliberated in the summer of 1789, when it was considering a set of amendments to the Constitution and legislation to create the first federal judiciary.

The first draft of section 27 of the judiciary bill, which dealt with juries in criminal cases, did not include a provision that a criminal defendant should be tried by a jury of the vicinage. It was therefore moved in the Senate, which debated the bill first, that section 27 be amended to provide that " 'in criminal cases when the punishment is capital, the petit jury shall come from the body of the county where the fact was committed.' "[49] The motion to modify the bill in this fashion was defeated. The apparent reason for the defeat, as expressed by James Madison, was that the practice in the state courts on this matter was so diverse.[50]

On July 17, 1789, the Senate passed the judiciary bill and sent it to the House. Instead of taking it up immediately, the House considered a series of amendments to the judiciary article of the Constitution. Seventeen such amendments were adopted by the House on August 24 and sent to the Senate. One of the amendments provided that all criminal trials should be "by an impartial jury of the vicinage. . . ."[51]

Ten days after receiving the proposed amendments from the House, the Senate excised the amendment involving trial by a jury of the vicinage. Subsequent efforts to restore that portion of the amendment were voted down on September 9.[52] The following day, the Senate returned twelve of the amendments that had been submitted to it by the House. Madison perceived that the non-uniformity among the states with regard to drawing a jury from the vicinage led to " 'a dislike to the restraint with respect to vicinage which has produced a negative in that clause.' "[53] He further observed that the Senators viewed vicinage as " 'either too vague or too strict a term, too vague if depending on limits to be fixed by the pleasure of the law, too strict if limited to the country. . . . The Senate supposes also that the provision for "vicinage" in the Judiciary Bill will sufficiently quiet the fears which called for an Amendment on this point.' "[54]

---

**46.** *Id.* 68, 70, 72–73.

**47.** U.S.Const. art. III, § 2.

**48.** *Williams v. Florida,* 399 U.S. 78, 93 n. 35, 90 S.Ct. 1893, 1902, 26 L.Ed.2d 446 (1970); *see* Warren, *New Light on the History of the Federal Judiciary Act of 1789,* 37 Harv.L.Rev. 49, 105 (1923).

**49.** Warren, *supra* note 48, at 105, *quoting* Senate Journal, July 9 and 13, 1789.

**50.** *Id.* 106.

**51.** *Id.* 120. *See Williams v. Florida,* 399 U.S. 78, 94, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

**52.** 399 U.S. at 94 n. 37, 90 S.Ct. 1893.

**53.** Warren, *supra* note 48, at 128, *quoting* letter of James Madison to Edmund Pendleton, Sept. 14, 1789.

**54.** *Id.* 129, *quoting* letter of James Madison to Edmund Pendleton, Sept. 23, 1789.

As a result of the disagreement between the two chambers on the amendments to the Constitution, a conference committee was established. The proposal which emanated from the committee ultimately became the sixth amendment, and with regard to vicinage stated only that a criminal defendant is entitled to "an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law . . . ."[55]

In early September, the House began its final debate on the judiciary bill. Without material change, it was passed in the form already adopted by the Senate. Upon its return to the Senate for final approval, it was amended to include the following provision for trial by jury of the vicinage:

> [I]n cases punishable with death, the trial shall be had in the county where the offence was committed, or where that cannot be done without great inconvenience, twelve petit jurors at least shall be summoned from thence. And jurors in all cases . . . shall be returned as there shall be occasion for them, from such parts of the district from time to time as the court shall direct, so as shall be most favourable to an impartial trial, and so as not to incur an unnecessary expense, or unduly to burthen the citizens of any part of the district with such services.[56]

With the section governing the drawing of trial jurors in this form, the Judiciary Act

was signed by President Washington on September 24, 1789.

The Judiciary Act of 1789, and particularly section 29 of the Act, which pertains to the location from which jurors shall be drawn, has considerable import for the case at hand. In combination with the sixth amendment, it represents the resolution of the fears that the right to trial by a jury of the vicinage had not been preserved adequately in article III of the Constitution. Charles Warren later observed that the "final form [of the Judiciary Act] was closely tied up with, and largely dependent upon the fate of the various Amendments to the Judiciary Article of the Constitution which were being debated in Congress during the debates over the Judiciary Act itself."[57] The Supreme Court has remarked that the Judiciary Act of 1789 "was passed by the First Congress assembled under the Constitution, many of whose members had taken part in framing that instrument, and is contemporaneous and weighty evidence of its true meaning."[58]

Several themes emerge from the history surrounding the sixth amendment and the passage of the Judiciary Act. First, the proposition that a trial must take place before a jury drawn from within the state and federal judicial district[59] in which the crime was committed was considered salient enough to be guaranteed by the Constitution. Second, the concept that a criminal trial must be before a jury composed of residents of the county where the crime

---

55. *Id.* 128; *cf. Williams v. Florida,* 399 U.S. 78, 94–96, 90 S.Ct. 1893, 1903, 26 L.Ed.2d 446 (1970).

56. Act of Sept. 24, 1789, ch. 20, § 29, 1 Stat. 88.

57. Warren, *supra* note 48, at 54. The same law review article was instrumental in the Supreme Court's disapproval, in the watershed *Erie* decision, of its own previous construction of the Rules of Decisions Act, which was first enacted as § 34 of the Judiciary Act of 1789. Warren was described by the *Erie* Court as a "competent scholar . . . ." *Erie R.R. v. Tompkins,* 304 U.S. 64, 72, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

58. *Wisconsin v. Pelican Ins. Co.,* 127 U.S. 265, 297, 8 S.Ct. 1370, 32 L.Ed. 239 (1888).

59. The "districts" referred to in the sixth amendment were the federal judicial districts, established elsewhere in the Judiciary Act. Act of Sept. 24, 1789, ch. 20, § 2, 1 Stat. 73. The Act established 13 districts for the 11 states that then existed (North Carolina did not ratify the Constitution until 1789, Rhode Island not until 1790; Massachusetts (which then included Maine) and Virginia (which then included Kentucky) each had two districts, and each of the other states had one. The principle adopted in 1789—that a judicial district shall not include portions of two or more states— has been followed almost uniformly to the present day, although exceptions exist, *see* 28 U.S.C. § 131 (1970).

occurred was not deemed to be of sufficient consequence to be guaranteed by the Constitution. Rather, if such a rule was to be adopted, it would have to be done by Congress. Third, the same Congress that submitted the sixth amendment to the states required by statute that in federal trials, capital crimes would be tried in the county of the crime or, if elsewhere, before twelve jurors drawn from the county of the crime; and Congress further required that noncapital crimes would be tried before jurors drawn from those portions of the district designated by the court.[60]

The leading early circuit court decision construing section 29 of the Judiciary Act is in accord with these propositions. It demonstrates in particular the broad latitude allowed the courts in determining the portion of the district from which the jurors should be drawn. In *United States v. Stowell*,[61] Justice Curtis, sitting circuit, delivered an opinion in which the court granted the defendant's motion to quash the indictment. But in a dictum of some moment, he described and analyzed the plan adopted by the federal court in Massachusetts for the trial of criminal cases. The circuit court there had established a set of ten tables, each drawing on the population of one town or city in Massachusetts and including a list of potential jurors to be drawn from that town for trial duty. All juries for a given term of the court were to be taken from one of the tables only. "The roster embraces a large part of the maritime towns and cities of the state, and many others, whose local situation renders access to the place where the court is required by law to be held, comparatively cheap and easy. It exclude[s] the more remote interior towns of the state altogether."[62]

According to Justice Curtis, the purpose of the Massachusetts arrangement, which was the sole method of allocating petit jury duty, was to obtain a jury conversant with the basic kinds of facts that might be tried; to avoid unnecessary expense, as mentioned in section 29 of the Judiciary Act; and to place a sufficient number of people on the jury rolls so that no single set of citizens would be overburdened, a consideration also mentioned in the Act.[63] In the court's view, this plan was perfectly acceptable and in compliance with section 29.

If the understanding of the *Stowell* court was correct, then it would appear that a plan which excludes from jury service citizens of the town in which the crime was committed would comport with the requirements of the Judiciary Act. In thus complying with the strictures of section 29 of the Act, it presumptively would also satisfy the sixth amendment.

### D.

Very few courts have construed the operative portion of the sixth amendment—that the jury shall be drawn from "the State and district wherein the crime shall have been committed"—in the face of a situation resembling the one before us today. Before the Supreme Court's decision in *Duncan v. Louisiana*,[64] which applied the basic constitutional guarantee of a jury trial in a criminal case to prosecutions by the states, through the medium of the due process clause, the state-and-district clause was naturally interpreted only in the context of federal prosecutions.

After its decision in *Duncan,* the Supreme Court ruled that a particular element of the sixth amendment jury guarantee is applicable to prosecutions by the states only if it is

---

**60.** Blume, *supra* note 3, at 66. The mandate that 12 jurors be summoned from the county of the crime in capital cases was repealed in 1862. Act of July 16, 1862, ch. 189, § 2, 12 Stat. 589.

**61.** 27 F.Cas. p. 1350 (No. 16,409) (C.C.D.Mass. 1854). Other early decisions construing § 29 of the Act are *United States v. Wilson,* 28 F.Cas. p. 699, 716, 717 (No. 16,730) (C.C.E.D.Pa.1830), *appeal dismissed,* 32 U.S. (7 Pet.) 149, 8 L.Ed.

640 (1833), and *United States v. Cornell,* 25 F.Cas. pp. 650, 653 (No. 14,868) (C.C.D.R.I. 1820).

**62.** 27 F.Cas. at p. 1354.

**63.** *Id.*

**64.** 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

fundamental to the central purpose of the requirement of a jury trial in a criminal prosecution.[65] The central purpose of the jury trial "is to prevent oppression by the Government by providing a 'safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.' . . . 'Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the common-sense judgment of a group of laymen . . . .' "[66] If the state-and-district guarantee does not further that purpose, it will not be held to limit the discretion of the state to try a defendant without heeding that clause of the sixth amendment.[67]

We need not now decide that question, however, since it is not necessary to the result we reach today. Rather, we assume for the purposes of discussion, without expressing any views upon the matter, that the state-and-district guarantee is so closely related to the purpose of the jury-trial guarantee that it is applicable to the states.

■■■■ Several general principles should be kept in mind as we analyze the specific situation before us. A defendant may not be tried, over objection, in a federal judicial district other than the one in which the crime was committed,[68] but there is no constitutional right to have the jurors drawn from the entire district.[69] Nor does a defendant have a constitutional right to be tried in the place of his residence.[70] When a federal judicial district has been carved into divisions, the accused has no right to a trial held in a particular division, even the one where the crime occurred,[71] since the constitutional guarantee is written in terms of districts. Beyond these general propositions it must also be noted that New Jersey consists of one judicial district.[72]

Further guidance may be obtained from the opinions of courts that have addressed the validity of geographical exclusion in situations similar to that presented by Zicarelli. In a series of cases dealing with federal prosecutions, several courts have held that the exclusion from the jury of persons from particular geographical areas does not violate the sixth amendment. State courts that have grappled with the

---

**65.** *Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972) (plurality opinion); *Williams v. Florida,* 399 U.S. 78, 99–100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).

**66.** *Apodaca v. Oregon,* 406 U.S. 404, 410, 92 S.Ct. 1628, 1632, 32 L.Ed.2d 184 (1972) (plurality opinion), *quoting Duncan v. Louisiana,* 391 U.S. 145, 156, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), *and Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). *Accord, Ludwig v. Massachusetts,* —— U.S. ——, 96 S.Ct. 2781, 49 L.Ed.2d 732 (1976); *Taylor v. Louisiana,* 419 U.S. 522, 530, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

**67.** The guarantee is certainly more easily utilized in federal than in state prosecutions, since it is not obvious that there is a geographical unit at the state level that corresponds to the "district" on the federal level. *See Bradley v. Judges of the Superior Ct.,* 531 F.2d 413, 417 n. 10 (9th Cir. 1976); *People v. Jones,* 9 Cal.3d 546, 550–51, 108 Cal.Rptr. 345, 348–49, 510 P.2d 705, 708–09 (1973). *Cf. United States v. Wilson,* 28 F.Cas. p. 699, 717 (No. 16,730) (C.C. E.D.Pa.1830), *appeal dismissed,* 32 U.S. (7 Pet.) 149, 8 L.Ed. 640 (1833); *Maryland v. Brown,* 295 F.Supp. 63, 80–81 (D.Md.1969).

**68.** *Salinger v. Loisel,* 265 U.S. 224, 232, 44 S.Ct. 519, 68 L.Ed. 989 (1924).

**69.** *Ruthenberg v. United States,* 245 U.S. 480, 482, 38 S.Ct. 168, 62 L.Ed. 414 (1918).

**70.** *Platt v. Minnesota Mining & Mfg. Co.,* 376 U.S. 240, 245, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964); *Johnston v. United States,* 351 U.S. 215, 220–21, 76 S.Ct. 739, 100 L.Ed. 1097 (1956); *United States v. Anderson,* 328 U.S. 699, 705, 66 S.Ct. 1213, 90 L.Ed. 1529 (1946); *Haas v. Henkel,* 216 U.S. 462, 473, 30 S.Ct. 249, 54 L.Ed. 569 (1910).

**71.** *Barrett v. United States,* 169 U.S. 218, 228–29, 18 S.Ct. 327, 42 L.Ed. 723 (1898); *United States v. Brown,* 535 F.2d 424 (8th Cir. 1976); *Franklin v. United States,* 384 F.2d 377, 378 (5th Cir. 1967), *cert. denied,* 390 U.S. 954, 88 S.Ct. 1048, 19 L.Ed.2d 1147 (1968); *Lafoon v. United States,* 250 F.2d 958, 959 (5th Cir. 1958); *McNealy v. Johnston,* 100 F.2d 280, 282 (9th Cir. 1938). With regard to grand jurors, *compare United States v. Wan Lee,* 44 F. 707, 708 (D.Wash.1890), *with United States v. Dixon,* 44 F. 401, 402 (N.D.Cal.1890).

**72.** 28 U.S.C. § 110 (1970).

problem have occasionally found constitutional violations.

The decision of the Fourth Circuit in *United States v. Florence*[73] is typical of the federal cases. It involved a trial that took place in the Northern District of West Virginia. There were six "places for holding court" in that district, which are similar to, but not strictly identical with, divisions of a federal judicial district. Although Florence's crime had occurred at Parkersburg, one of the six places for holding court, he was indicted and tried at Elkins. Because Elkins was the place of trial, the petit jurors were chosen from the counties surrounding Elkins. As a result, no petit jurors were selected from the area where the crime was committed. Observing that Parkersburg and Elkins are both generally rural areas, an element that may have had some bearing on the decision, the Fourth Circuit held that since the jury came from both the state and district in which the crime had been committed, no rights of the defendant had been breached. The court thus necessarily ruled that the defendant had no constitutional right to a jury drawn in whole or in part from that portion of the district encompassing the location of the crime.[74]

Similarly, the First Circuit has rejected an argument that the sixth amendment was violated when persons from certain counties within the District of Maine were excluded from the jury, reasoning that the attitudes of those in the excluded counties were represented upon the jury by persons from the remaining counties within the district.[75] The Second Circuit had earlier taken a similar approach, albeit focusing upon rural residence rather than upon attitudes, in upholding a jury plan in which residents of eight of the eleven counties making up the Southern District of New York were excluded from jury service. Some portions of the three counties represented on the jury were rural observed the court, so that there was representation of rural residents on the jury.[76] More recently, in a case in which jurors were drawn only from that portion of the district that was physically closest to the site of the courthouse, resulting in the exclusion of many potential jurors, a district court found no constitutional impediment.[77]

The leading state-court decision upholding an argument that exclusion of jurors from the area of the crime violated a defendant's constitutional rights is that of *People v. Jones*,[78] the California case that counsel had referred to the New Jersey Supreme Court. The 77th Street Precinct in Los Angeles, in which the crime occurred, was within the jurisdiction of the Central District of the Superior Court. Nonetheless, solely because there were not enough judges or courtrooms available in the Central District to handle that district's

**73.** 456 F.2d 46 (4th Cir. 1972).

**74.** *Id.* at 49.

**75.** *United States v. Butera*, 420 F.2d 564, 572 (1st Cir. 1970). *See United States v. Cates*, 485 F.2d 26, 28 (1st Cir. 1974) (statutory analysis only).

**76.** *United States v. Gottfried*, 165 F.2d 360, 363–64 (2d Cir.) (L. Hand, J.), *cert. denied*, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139 (1948).

**77.** *United States v. Brown*, 281 F.Supp. 31, 37–39 (E.D.La.1968). The Fourth Circuit has noted that exclusion of either a rural or an urban populace and inclusion of the other is a more significant "criterion for measuring jury selection" than is the exclusion of all potential jurors residing beyond a given distance from the courthouse. *United States v. DiTommaso*, 405 F.2d 385, 392 (4th Cir. 1968), *cert. denied*, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969). *See also Katz v. United States*, 321 F.2d 7, 9 (1st Cir.), *cert. denied*, 375 U.S. 903, 84 S.Ct. 193, 11 L.Ed.2d 144 (1963). In a case presenting rather unusual factual circumstances, Judge Friendly was critical of the procedure of excising from jury duty residents of a judicial district who live more than 25 miles from the site of trial. *United States v. Fernandez*, 480 F.2d 726, 734 (2d Cir. 1973) (dictum). *Cf. Bradley v. Judges of the Superior Ct.*, 531 F.2d 413, 417 (9th Cir. 1976) (dictum) (selecting jurors from entire county is constitutional, despite fact that racial minority constitutes larger percentage of population of area where crime was committed than of county as a whole).

**78.** 9 Cal.3d 546, 108 Cal.Rptr. 345, 510 P.2d 705 (1973).

trial work, the presiding judge of the Superior Court had ordered that all crimes committed in the 77th Street Precinct would be tried in the Southwest District. Inasmuch as all jurors for any district's trials were drawn from that district alone, persons who committed crimes in the 77th Street Precinct were necessarily tried by jurors who resided in a different state-court judicial district than that in which the crime had been committed.

In a four-to-three decision, the California Supreme Court held, first, that the state-and-district requirement is an essential element of the right to a jury trial in a criminal case, and thus must be applied by the states. The court then held that a jury drawn from a portion of the county only, excluding the place where the crime was committed, violated the sixth amendment guarantee.[79] Although the black population of the 77th Street Precinct was approximately tenfold that of the Southwest judicial district (73% compared to 7%), the court stated that demographic differences were not relevant to its decision. Rather, the court reached a *per se* rule that is not dependent upon demography.[80]

Other state courts, while expressing disapproval of jury plans that exclude residents of the area where the crime was committed, have nonetheless rejected the sixth amendment argument dealing with such exclusion.[81]

It would thus appear that the few state courts that have addressed the question are divided on whether the sixth amendment prohibits the exclusion from the petit jury of residents of the area, however the word "area" is defined, in which the alleged crime was committed. The decisions of the federal courts, and they are not numerous either, are not so divided. The clear majority of all the cases dealing with the problem holds that the Constitution has not been violated in such a factual scenario. The interpretation of the sixth amendment that is found in the majority of the cases is also supported by the literal text of the sixth amendment and the language of the Judiciary Act of 1789, which, as already observed, is an important indicator of the meaning of the sixth amendment.

In shaping the sixth amendment and the Judiciary Act of 1789, the Framers obviously contemplated that there would be some geographical distinctions in the drawing of trial jurors. However, the geographical restraints were not narrowly drawn. The sixth amendment prohibits courts only from obtaining petit jurors from beyond the boundaries of two large units, the state and the federal judicial district. And the Judiciary Act specifically provided that residents of portions of those units could be excluded from the petit jury altogether. This latter concept was demonstrated in such decisions as *Stowell*. Smaller geographical units, such as towns or counties, were not considered critical enough, for purposes of the guarantee of a jury trial in a criminal case, to serve as limitations upon the drawing of jurors in non-capital crimes.[82] The Framers were concerned, in-

---

**79.** *Id.* at 549–54, 108 Cal.Rptr. at 348–51, 510 P.2d at 708–11.

**80.** *Id.* at 554, 108 Cal.Rptr. at 351, 510 P.2d at 711. *Jones* was followed in *People v. Casillas,* 33 Cal.App.3d 1078, 1080, 109 Cal.Rptr. 579, 580 (2d Dist. 1973). The *Jones* court based its decision in part on that of the Alaska Supreme Court in *Alvarado v. State,* 486 P.2d 891 (Alaska 1971), which is the other state-court decision that gives the most support to Zicarelli. *Alvarado* was premised upon the cross-section decisions of the United States Supreme Court, however, and as such does not bear upon the single sixth amendment issue that we meet on the merits today. Extensive dicta in *Maryland v. Brown,* 295 F.Supp. 63, 83 (D.Md.1969), were also relied upon in *Jones.*

**81.** The decision in *People v. McDowell,* 27 Cal. App.3d 864, 104 Cal.Rptr. 181 (4th Dist. 1972), predating *Jones,* resembles *Alvarado* in certain ways. The court in *McDowell* ruled that a geographical exclusion is invalid only if it discriminates against a particular racial, social, or economic class, and that the exclusion of rural jurors in favor of urban ones would transgress the Constitution only if it were shown that attitudes actually differed between those two groups. *See also People v. Scher,* 76 Misc.2d 71, 349 N.Y.S.2d 902, 911 (Sup.Ct.1973).

**82.** The county did serve as such a limitation for the trial of capital crimes. But as already noted, *see* note 60 *supra,* that provision was later repealed.

sofar as is relevant here, only with a situation in which petit jurors came from without the state or without the district.

*Florence* and the majority of the other decisions appear to allow substantially the same latitude as was given the federal courts in the late eighteenth century. With few exceptions, the modern cases require that the petit jurors be drawn from within the state and federal judicial district in which the crime was committed, but they do not compel a narrower geographical focus than that. They are thus consistent with the understanding of the geographical limitations expressed by Congress in 1789 and adopted by the states in the following two years. And they adhere to the historical ambience of the amendment.[83]

■ We therefore hold that Zicarelli's federal constitutional rights were not transgressed when the State of New Jersey tried him before a jury drawn from Burlington County on charges of criminal activity that had occurred in Hudson County. The petit jury was drawn from both the state and the federal judicial district within which the crimes occurred, and the state-and-district guarantee of the Constitution promises no more.

### E.

We have examined the other contentions asserted by Zicarelli that were exhausted in the state courts and find them without merit.

### F.

The judgment of the district court will accordingly be affirmed, without prejudice to Zicarelli to pursue in the state courts, and then in the district court if necessary, his sixth amendment claims relating to the cross-section and previously-ascertained-by-law issues.

**83.** The contrary decision in *Jones,* although disavowing reliance upon the racial disparities that existed between the two relevant geographical areas that were involved there, may nonetheless be explained on the ground of such disparity.

### APPENDIX I

### PORTIONS OF TRANSCRIPT OF ARGUMENT BEFORE THE COURT EN BANC ADDRESSING THE EXHAUSTION QUESTION

JUDGE GARTH: Mr. Weissbard, you invited questions; I have one for you.

COUNSEL: Certainly, your honor.

JUDGE GARTH: I'd like to know how and if the issue that we have evidence in (inaudible), was presented to the Supreme Court of New Jersey on the exhaustion aspect because I'm disturbed about the fact that although the panel opinion recites that counsel apparently addressed this issue orally before the Supreme Court, apparently it was never briefed and there is no Supreme Court opinion which deals with it.

COUNSEL: The issue, your honor, as raised initially in the State courts was focused more on the question of venue than on that of vicinage, if I can use that phraseology. You know, where the jury was from. The focus definitely was not as it came to be in this proceeding. However, as I think the panel pointed out—I'm going to answer your question—but I think it's significant to note that basically the essential issue, you know, that whether Zicarelli was properly tried in Burlington County and albeit, the focus of attack was somewhat different. It's not as though we're trying to raise here something which was never before the State courts and I think it's fair to say that the result reached on the reasoning of the State court, if you read their opinion—I don't think it would have made any difference, you know, what approach we had taken. However, what had happened was that when we got around to the second appeal, which was the *Louf* appeal as opposed to what we call the *Armallino,* which the first one; when we got around to that one, *People v. Jones* had come out and

it had been called to our attention and at that point the case was on appeal to the Supreme Court and it had already been—in *Louf* there had been a partial reversal, well actually there had been a total reversal in the appellate division, and certification was granted. So we sent a letter, or counsel for Mr. Louf did, sent a letter to the court, asking them to consider on this issue of the place of trial or the jury selection—consider the implications of *People v. Jones.* When we went to the Supreme Court, the issue was argued and I was there, and the Court said in effect, "Well we've read that, you know, we really don't think much of that opinion." That was in an affidavit that was submitted in the habeas corpus proceedings below and I think that's the foundation of it.

JUDGE GARTH: I understand that.

COUNSEL: But there is no opinion focusing on this issue. You're correct. Of course, the *Louf* opinion did not address this matter whatsoever. It relied on the *Armallino* opinion altogether on this issue. *Louf* was concerned with the question of double jeopardy and whether a reversal on the conspiracy caused a reversal on substantive counts, different issues.

JUDGE GARTH: Well, let me put it to rest very rapidly, if I may. As I understand it then, the very issues briefed here were not briefed before the Supreme Court but were raised in supplementary proceedings or supplementary oral proceedings and were never addressed by the Supreme Court.

COUNSEL: I think that's fair to say in a general way, although I think and I certainly agree with the panel's view of this matter that I think the exhaustion requirements respectfully were sufficiently satisfied taking, you know, the overall picture of what was addressed in *Armallino* and how it was raised in *Louf* and what the central issue was we were talking about the whole time. But I have to agree that the focus was never as it is here.

JUDGE ALDISERT: I'd like to clear out one bit of underbrush too. In view of *Estelle v. Williams* which just came down May 3rd, can we be assured that this constitutional issue was presented before the trial judge?

COUNSEL: Well, yes, there's no question on that whatsoever. The question of whether the sixth amendment rights were violated, and when you say this constitutional issue, I don't want to get confused with what Judge Garth was asking me—

JUDGE ALDISERT: He's talking about the main thrust of the panel opinion.

COUNSEL: Yes. Well, as I view—

JUDGE GARTH: Was it presented in the county aspect, or was it presented in the cross-section aspect, if I can label them that way?

COUNSEL: I think more the county aspect, rather than the cross-section aspect, but it was raised in terms of whether his sixth amendment rights were violated, you know, by trial in Burlington County and in the correct terms—

JUDGE HUNTER: . . . The contrary is now labeled cross-section. All right? We'll use that.

\*     \*     \*     \*     \*     \*

COUNSEL: As you are aware, pursuant to the rules in our state governing the trial of indictments returned by statewide grand juries, rules that I might say never had been construed before this case came up, or at least before the first Zicarelli case was appealed, this case went to trial by assignment in rural Burlington County in the southern part of New Jersey when the crimes alleged in the indictment and proven in the trial arose in Hudson County up in the northern part of the state. Now, I think it's fair to say and I don't think anybody disputes that there could not have been a more significant contrast between the two counties if you tried to take any two in the State of New Jersey.

JUDGE GARTH: Well, let's talk to you about that for a moment, Mr. Weissbard. There is nothing in the record, apparently, that would show us the disparity in whatever the stated factors are, if they're demographic factors or whatever they may be. Apparently, the panel opinion took judicial notice of certain aspects but I couldn't find anything in the record. Did you make a record of it?

COUNSEL: Well, the very same judicial notice type of sources that were cited by the panel were raised in the very initial briefs to the trial court, to Judge Van Sciver by one of the co-counsel.

JUDGE GARTH: Well, is this the sort of thing that you would have raised had you been afforded an evidentiary hearing by the magistrate? Is this the kind of record you envisaged?

COUNSEL: No, I don't think we were planning to make it—

JUDGE GARTH: Did you ever make an offer to—develop a record on the very aspect of demography, you might say, that the panel seized upon?

COUNSEL: No, and we still maintain that, we think that the sources relied upon by the panel were entirely sufficient to demonstrate what frankly is just a matter of, call it judicial notice, call it common sense—we think it's clear to everybody which is the difference between Burlington County and Hudson County. But the answer is no; we never thought to make a record on it and I can't fairly say that that was in our mind. Actually, we never sought an evidentiary hearing before the magistrate at all. All we really were complaining about if you noticed in our initial brief is we never even got an oral argument before the magistrate or the district court. We were prepared to argue the law. I don't think we were, you know, going to make a record on this point.

CHIEF JUDGE SEITZ: The big issue is whether it makes a difference and I guess it could be auxiliary to that to decide whether we have a sufficient record made.

\* \* \* \* \* \*

JUDGE GIBBONS: Did you argue in any court the third leg of the sixth amendment that the district shall have been previously ascertained by law?

COUNSEL: No, we did not get involved in that. I think we run into a problem when we try to argue or try to reason out the fact that the sixth amendment, you know, in its terms was violated here. The historical analysis kind of falls apart on us.

JUDGE GIBBONS: Well, yes and no. The previously ascertained by law provision has been interpreted in the federal cases as a due process limitation on prosecutorial discretion to pick venues from which petit jurors will be selected. It's at least arguable that the due process clause of the Fourteenth Amendment would pick up the same requirement. If you haven't argued that to the Supreme Court of New Jersey, I suppose it wouldn't—

. COUNSEL: Well, I think that only insofar as the *Jones* case, you know, discusses that, you know and I think they do to some extent. *Jones* was what was argued. That was the only case that raised the specific issue that was brought up and the reason, as I say it came about was because *Jones* had just come out at the time that that matter was pending.

JUDGE GIBBONS: Is it your position then that in some form or another any sixth amendment argument that's available was presented to the Supreme Court—

COUNSEL: Absolutely. I see no upset in the principles of exhaustion or comity or anything else in this court finding any available sixth amendment rationale since we did raise this basic complaint and I think that's what exhaustion is all about. We're not asking you to overturn—

JUDGE GARTH: Exhaustion requires that it be fairly presented to the Supreme Court and so far what we have is a fairly naked record on the subject, at least of those matters on which you rely and an oral argument made to the Supreme Court based upon a case which had come down after briefing and no briefs to the Supreme Court. Do I fairly state it?

COUNSEL: I think so—all I can refer you to if there's any doubt on that is if you'll take a look at the briefs that were submitted to the appellate division in both the *Armallino* and the *Louf* case.

JUDGE GARTH: The appellate division only dealt, as I read their opinion, with the county aspect as distinct from the argument that the panel picked up here.

COUNSEL: Yes. The sixth amendment question was raised but it was raised primarily I think with the focus on that county argument, although cases such as *State of Maryland v. Brown* were argued in the appellate division brief. Now, I would say, look at the briefs, your honor, more than looking at the opinion. As you know, the opinion doesn't always touch on everything that's raised in the briefs.

## APPENDIX II

## LETTER FROM COUNSEL TO NEW JERSEY SUPREME COURT TRANSMITTING OPINION IN PEOPLE v. JONES

October 26, 1973

Ms. Florence P. Peskoe
Assistant Clerk

Dear Ms. Peskoe:

Please be advised that in the above entitled case, which is scheduled for argument on November 7, 1973, at 10:00 A.M., Ray Louf will rely on the case of *People v. Jones*, 9 Cal.3d 546, 108 Cal.Rptr. 345, 510 P.2d 705, (1973).

Very truly yours,

## APPENDIX III

## AFFIDAVIT OF HARVEY WEISSBARD UNITED STATES DISTRICT COURT DISTRICT OF NEW JERSEY

Civil No. 74–179

JOSEPH ZICARELLI,

Petitioner,

*v.*

ALBERT D. GRAY, JR.,
Superintendent of the New Jersey State Prison,

Respondent.

AFFIDAVIT

STATE OF NEW JERSEY 
COUNTY OF ESSEX *ss:*

HARVEY WEISSBARD, of full age, being duly sworn according to law upon his oath deposes and says:

1. I am an attorney at law of the State of New Jersey and a member of the firm of Isles and Weissbard, 55 Park Street, Montclair, New Jersey. We represent the petitioner Joseph Zicarelli in the within matter.

2. On November 5, 1973 I appeared before the New Jersey Supreme Court to argue on behalf of Mr. Zicarelli in the case subsequently reported as *State v. Louf,* 64 N.J. 172, 176, 313 A.2d 793 (1973).

3. As to Zicarelli, certification had been granted on the state's petition with respect to that portion of the Appellate Division ruling that granted Zicarelli a new trial on his substantive count convictions. 126 N.J. Super. 321, 314 A.2d 376 (App.Div.1973). Accordingly, the only aspect of Zicarelli's case before the court for argument was with respect to the correctness of the Appellate Division reversal. However, Louf had been granted certification on his own motion, without limitation. Under our court rules, Rule 2:12–11, this brought Louf's entire case before the court and permitted him to argue all issues raised below.

4. On October 26, 1973, about two weeks before the argument, Louf's attorney, Gerald D. Miller, Esq., sent a letter to the Supreme Court advising them that he

**486**

would rely on *People v. Jones,* 9 Cal.3d 546, 108 Cal.Rptr. 345, 510 P.2d 705 (1973), in support of his argument.

5. On November 5, 1973 Mr. Miller, in his argument to the Supreme Court did argue the "venue" question and mentioned the *Jones* case. At least one of the Justices questioned him on this point and indicated a familiarity with the *Jones* decision. The Justices indicated, however, by their questioning that they did not accept the conclusion of the *Jones* case. The argument then moved on to other matters. It is my recollection that this discussion of "venue" came right at the start of Mr. Miller's argument.

HARVEY WEISSBARD
Harvey Weissbard

Sworn and Subscribed to before me this 5th day of June, 1974.

JO ANN LANDARA
A Notary Public of New Jersey
My Commission Expires Jan. 24, 1979

VAN DUSEN, Circuit Judge (dissenting and concurring in part):

I respectfully dissent from the majority's holding that there has been no exhaustion of state remedies, with respect to appellant's claim that "the procedures employed by the state in assembling the jury violated the cross-section [requirement] of the sixth amendment"[1] (page 469 of majority opinion). I believe this claim was adequately presented to the state courts and hence that there has been exhaustion of state remedies as required by 28 U.S.C. § 2254(b).

The majority opinion concedes that Zicarelli's petition for a writ of habeas corpus alleged "that he was denied the right to trial by a jury comprising a representative cross-section of the locale where the crimes took place" (page 470).

Counsel for the State of New Jersey stated at the oral argument before the en banc court:

"As the court knows, we originally raised the issue of the exhaustion before the district court. The court held that our position was without merit. When the time came to apply to this court, we considered all the facts, the facts that in fact there had been a letter citing to *People v. Jones* which had been submitted to the State Supreme Court and at oral argument a reference had been made to that particular case. And we felt that in all fairness, it had been, as the courts require, fairly presented to the highest state court."

In *State v. Jones,* 9 Cal.3d 546, 108 Cal. Rptr. 345, 352, 510 P.2d 705, 712 (1973), the "In Bank" court stated:

"To recapitulate, we hold that the Sixth and Fourteenth Amendments to the United States Constitution as interpreted in *Williams*[2] and *Peters,*[3] guarantee a criminal defendant in a state trial the right to be tried by *an impartial jury comprising a representative cross-section of,* and selected from the residents of, the judicial district where the crime was committed." (Emphasis supplied.)

As conceded by the State, its Supreme Court had been furnished in writing with

---

1. This requirement has recently been described by the Supreme Court as follows in *Taylor v. Louisiana,* 419 U.S. 522, 530, 538, 95 S.Ct. 692, 697, 42 L.Ed.2d 690 (1975):

"We accept the fair cross section requirement as fundamental to the jury trial guaranteed by the Sixth Amendment . . . . De-fendants are not entitled to a jury of any particular composition . . . but the jury wheels, pools of names, panels or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."

2. *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), where the Court said at 100, 90 S.Ct. at 1906:

"[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence. . . ."

3. *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), where the Court held that an aspect of the constitutional right to a trial by jury is the "fair possibility for obtaining a representative cross-section of the community."

relator's reliance on *Jones, supra,* and that opinion had been referred to during the oral argument before that court. As I read *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971), relied on by the majority opinion, the holding of that case is clearly inapplicable to this record, where the state courts were furnished the very holding on which relator relies in his federal court petition and, further, the State Attorney General conceded before this court that the cross-section issue "had been, as the courts require, fairly presented to the highest State court."

This record demonstrates that the state courts "had a fair opportunity to consider the [cross-section] claim and to correct that asserted constitutional defect in respondent's conviction." In *Picard, supra* at 277–78, 92 S.Ct. at 513, the Court stated:

"Obviously there are instances in which 'the ultimate question for disposition,' . . . will be the same despite variations in the legal theory or factual allegations urged in its support. . . . We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts." [4]

In my view, the procedure of excluding from the jury pool all residents of northeastern New Jersey may have "systematically excluded from the jury distinctive groups in the community" where the crime was committed and thereby violated the Sixth and Fourteenth Amendments' fair cross-section requirement by causing the jury venire "to fail to be reasonably representative" of the community. The State does not deny that there are very often substantial differences between residents of different geographical areas. Although cases may arise where the prosecutor might demonstrate that there are no significant differences between the geographical groups from which the venire is drawn and the excluded group, facts subject to judicial notice suggest that significant differences exist here. As the panel noted in its November 18, 1975, opinion (page 11 at note 24):

"In this case, the crimes were alleged to have occurred in Hudson County, which has a population density of almost 13,000 people per square mile, and the jurors were selected from Burlington County, which has a density of only 395 people per square mile. U. S. Bureau of the Census, Department of Commerce, County and City Data Book 1972. There are many other differences as well, including: (1) the farm and rural nonfarm population of Burlington County is 63,000; that of Hudson County is 0; (2) 17.4% of Burlington County's residents are of foreign stock, compared to 42.1% of Hudson County's residents; and (3) the median number of school years completed by the residents of Burlington County is 12.3, while the median number of years completed by residents of Hudson County is 10.2. *Id.*"

On the basis of these facts, Hudson County residents appear to be a "distinctive group" when compared with the residents of Bur-

---

4. In *Picard, supra* at 275, 92 S.Ct. at 512, the Court emphasized that "the exhaustion-of-state-remedies doctrine . . . reflects a policy of federal-state comity." In this case, the State Attorney General has conceded that exhaustion has taken place as noted above.

The panel opinion of November 18, 1975, contained, *inter alia,* this wording at pages 5–6: "At oral argument before this court . . . appellant's attorney stated that this theory was presented to the New Jersey Supreme Court at oral argument in *State v. Louf,* 64 N.J. 172, 313 A.2d 793 (1973). The New Jersey Deputy Attorney General, who argued this case before both us and the State Supreme Court, did not dispute this claim at oral argument. Moreover, the State's brief did not raise any claim of lack of exhaustion . . . . In light of these circumstances, we conclude that the exhaustion requirement has been satisfied as to the second (*Louf*) conviction. Further, we understand the State's failure to raise the exhaustion issue as to the first conviction to be a tacit acceptance of the rationale of *Rowe v. Peyton,* 383 F.2d 709, 711–12 (4th Cir. 1967). In that case, it was held that where a petitioner presents an issue identical to one recently decided by the State's highest court in another case, the requirements of 28 U.S.C. § 2254(b) were met, even though petitioner did not himself present the issue to the State. In the instant case, not only is the issue identical but also the parties are identical."

lington County. Also, the complaint of petitioner-appellant against his trial in rural, southern New Jersey, as opposed to the community in urban, northeastern New Jersey where the crime was committed, would appear to be a claim of unconstitutional discrimination in jury selection which finds support in the above-quoted data. The unequal treatment of normally drawing petit juries from the county where the crime is committed but excluding from such jury of this defendant many persons of the predominant types in that county, having, for example, over 42% of its population of foreign stock, for a criminal trial in an area where only 17% of the residents are of foreign stock, is contrary to decisions such as *Hernandez v. Texas,* 347 U.S. 475, 478, 74 S.Ct. 667, 98 L.Ed. 866 (1954).

I believe that the cross-section requirement of the Sixth Amendment[5] mandates vacating the judgment of the district court and the remand of this case to that court for a hearing and findings on the factual basis for the cross-section claim, or, in its discretion, for a stay of proceedings pending application of relator for post-conviction relief in the state courts on this cross-section claim so that an adequate record for determination of such claim may be made in the state courts.[6]

In all other respects, I concur in the majority opinion.[7]

I concur in the separate opinion of Judge Hunter.

HUNTER, Circuit Judge (concurring and dissenting in part):

I concur with Judge Van Dusen. Because the jury selection issue as I understand it has not been presented, I feel it worthwhile to describe this difficult problem.

The sixth amendment guarantees a criminal defendant the right to a trial by a jury drawn from a fair cross-section of the community.[1] The difficulty is in defining "community." In this case, the relevant "community" may be coextensive with New Jersey, Hudson County, Burlington County, or some as yet unformulated area. I agree with Judge Adams that every town in that "community" need not be represented, but I think it essential to define the perimeter of the "community" first.

5. In *Taylor v. Louisiana, supra,* the Court used this language, as well as the wording quoted above from that opinion:

"The unmistakable import of this Court's opinions, at least since 1941, *Smith v. Texas, supra,* and not repudiated by intervening decisions, is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial. [528]

. . . . .

"The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. *Duncan v. Louisiana,* 391 U.S. [145], at 155–156, 88 S.Ct. [1444] at 1450–1451 [20 L.Ed.2d 491]. This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." [419 U.S. at 530, 95 S.Ct. at 697]

6. It will be necessary to determine whether the pools of names from which these juries were drawn systematically excluded distinctive groups in the Hudson County or northeastern New Jersey community, where the crimes were allegedly committed.

7. Since the State of New Jersey and the United States Judicial District of New Jersey include the same area, this appeal raises no problem with "the State and district" requirement of the Sixth Amendment. Also, no contention was made before the state courts or the United States District Court based on "the previously ascertained by law" requirement.

1. The sixth amendment itself refers only to an "impartial jury of the State and district wherein the crime shall have been committed," but as interpreted by the Supreme Court this includes the requirement that the jury be drawn from a fair cross-section of the community. *See, e. g., Taylor v. Louisiana,* 419 U.S. 522, 526–31, 95 S.Ct. 692, 42 L.Ed.2d 690 (1974).

The state practice of drawing a jury only from the county in which the court sits raises serious constitutional issues. That selection practice, when combined with the ability to choose the trial county, results in the evisceration of any constitutional cross-section requirement. Once a narrow "community" is chosen, a panel that represents that community perfectly may nonetheless violate the sixth amendment, in my view.

In light of the actual disposition of the case, it is unnecessary at this time to decide the issue as I have raised it. The state court will have the opportunity to grapple with this difficult issue.

GIBBONS, Circuit Judge (concurring):

I agree with Judge Van Dusen that the fair cross-section requirement claim was presented to the New Jersey courts and that there has been exhaustion of New Jersey remedies for that claim within the meaning of 28 U.S.C. § 2254(b). I do not agree, however, that the selection of Burlington County over Hudson County was a violation of the fair cross-section requirement. Zicarelli makes no real claim of systematic or intentional exclusion of any class of persons from the jury actually selected. Jury selection methods in Burlington, on the record before us, meet federal standards. Thus I do not agree that a further hearing on that claim is required, and I would affirm the district court's denial of habeas corpus on that ground.

I agree with Judge Adams that the predetermined district claim has not been presented to the state courts and that it is indeed a substantial claim of a due process violation. The exhaustion rule codified in 28 U.S.C. § 2254(b) is not jurisdictional, and the long delay in the determination of this habeas corpus petition might well justify disregarding the requirement and considering the merits of the issues. In this case, however, it seems the preferable course to permit the New Jersey courts the opportunity to develop a record of whatever justification may exist for that State's non-compliance with the predetermined district standard before any federal court considers whether the standard is as a matter of due process applicable to the states.

Thus I concur in the judgment of the court.